THE CENTRAL RAILROAD COMPANY *et al.*, plaintiffs in error, *vs.* STEPHEN COLLINS *et al.*, defendants in error.

1. The State of Georgia, being a stockholder in the Atlantic and Gulf Railroad Company, may, on her own motion, become a party to a bill filed by other interested persons against the City of Savannah, the Central Railroad, the Southwestern Railroad, and the Atlantic and Gulf Railroad, to enjoin the consummation of a contract by which a controlling amount of the stock of the Atlantic and Gulf Road is about to pass into the control of the Central and Southwestern Roads. A citizen of the State, as such, is not a proper party to a bill to enjoin a Railroad Company from illegally making a purchase of stock in another Railroad Company, but if there are other proper parties to the bill, this objection is not a good ground of general demurrer.

2. If one be a *bona fide* holder of stock in a Railroad Company, and file a bill to enjoin the Company from making a purchase not authorized by the charter, it is not a sufficient reply to the bill, that the plaintiff is not in good faith seeking the interests of the Company, but is acting in the interests of a rival road. Each stockholder has a right to stand upon his contract, as provided by the charter.

3. The banking powers of Central Railroad and Banking Company, and the incidents thereto, expired on the 14th of December, 1868, and after

The Central Railroad Company *et al.*, *vs.* Collins *et al.*

that date, the general powers of the said Company to buy and hold real and personal property and make contracts are confined to such property and such contracts as are incident to the building, managing and maintaining the Railroad contemplated and provided for by the charter, and the purchase of stock in another, and especially in a rival Railroad Company, is outside of the objects of the charter.

4. Neither the Central Railroad Company nor the Southwestern Railroad Company, is authorized, by its charter, to become a stockholder in other Railroad Companies, and a Court of Equity will, at the instance of stockholders in the roads, enjoin a purchase of such stock by said Companies.

5. A Railroad Company chartered for the purpose of building and maintaining a Railroad from Savannah to Macon, with general powers to purchase and hold personal estate, of any character whatever, is not authorized to become a stockholder in a Railroad from Savannah to Bainbridge. Such purchase is wholly beyond the purposes of the charter.

6. It is a part of the public policy of the State, as indicated by the charter of several Railroads from the seaboard to the interior to secure a reasonable competition between said roads for public patronage, and it is contrary to that policy for one of said roads to attempt to secure a controlling interest in another, and any contract made with that view, will be set aside by a Court of Equity as illegal, beyond the objects of the charter, and contrary to the public policy of the State.

7. The Act of December, 1861, authorizing the connection of the Central Railroad and the Atlantic and Gulf Road, having, as is expressly recited in the preamble, been passed in furtherance of the late rebellion against the United States, is no indication of the policy of the State to permit the Central Railroad Company, to acquire in any manner a controlling interest in the Atlantic and Gulf Railroad.

8. When the City of Savannah and the Central Railroad and Southwestern Railroad Companies entered into a contract by which the said city transferred to said Railroad Companies 12,383 shares of stock in the Atlantic and Gulf Railroad ; 307 shares in the Montgomery and West Point Railroad ; 424 shares in the Savannah and Augusta Railroad ; and one share in the Southwestern Railroad, and the Mayor of the City of Savannah was a stockholder in the Central Railroad, and the said city one of the original corporators in said Central Railroad :

*Held,* that even if the Railroad charters are not public laws which all are bound to notice, the City of Savannah is charged with notice of the powers of the Central and Southwestern Railroad, and can not stand upon the footing of an innocent actor without notice. WARNER, J., dissents, as to the power of the Central Railroad Company to buy and of the City of Savannah to sell said stock, etc.

Powers of Corporations.    Injunction.    Before Judge COLE.    Chambers.    Bibb county, November, 1869.

Stephen Collins, as a stockholder in the Southwestern R. R. Company, and in the Atlantic and Gulf R. R. Company, and as a citizen of the State of Georgia, and of the city of Macon, Peter Solomon and Jas. A. Nisbet, trustees, in their own right, as citizens of the State of Georgia, and of the city of Macon, and as stockholders of the Southwestern R. R. Company, and George G. Hull, in his own right, as a citizen of the State of Georgia and stockholder of the Southwestern R. R. Company, and all, also suing in behalf of all others, citizens of Georgia, or of the city of Macon, or stockholders in the Southwestern Railroad Company, the Central Railroad and Banking Company, the Atlantic and Gulf Railroad Company, and any other citizen or stockholder in any other companies, who may be interested and come in and be made parties to this bill, made the following averments:   The said Southwestern Railroad Company is a private corporation, chartered by the General Assembly of the State of Georgia, whose principal office is at Macon, in the county of Bibb, for certain purposes, and with certain rights, privileges and franchises, distinctly set forth in said charter, which was granted on the 27th day of December, 1845, and amended at different times.   The original charter of said railroad company accurately defined the purpose of the organization, and declared the rights and privileges granted it, with the restrictions and limitations upon those rights and privileges, the third section declaring among other things, "that the company herein incorporated, shall confine their efforts and enterprise to the building and completion of a railroad communication from the city of Macon to some point intermediate between Albany and Fort Gaines, to be agreed upon by the company, from which point the company may construct branch railroads to Albany and Fort Gaines," and the rights and privileges granted by said charter were not enlarged by said amendatory Acts, nor was the restriction imposed by the said third section of said charter removed by any of the said amendatory Acts.   The Central Railroad and Banking Company, of the State of Georgia, a corporation chartered by the General

The Central Railroad Company *et al.*, *vs.* Collins *et al.*

Assembly of the State of Georgia, with its principal office at Savannah, Georgia, contributed materially to the building and equipment of the said Southwestern Railroad, and by the large amount of the capital stock of said Southwestern Railroad Company owned by it and by its stockholders, as well as by the large interest which it has in other railroads connecting with the said Southwestern Railroad, has for a series of years absolutely controlled the organization and the management of the said Southwestern Railroad Company.

These two great railroad corporations, acting together in perfect harmony, and having the control of almost unlimited means, have illegally combined and confederated together to break down all competing lines of railway, and to monopolize, as far as possible, the railroad transportation of the State of Georgia, and in carrying out this policy, the said Central Railroad Company has, within a few years past, granted large subsidies to the railroad corporations of this and other States, leased hundreds of miles of railroad in this and other States, and furnished large sums of money to connecting lines of steamboats and railroads in this and other States, until at the present moment it does, in fact, control almost absolutely the transportation, by sea and land, from New York to the western line of Alabama, and is still extending its connections and control, with the avowed purpose of monopolizing the transportation of freights and the travel between New York and Vicksburg, in the State of Mississippi.

As a necessity, to enable those corporations to carry out this policy of extension and monopoly, and as a necessary result of that policy, these two corporations have for several years discriminated against the people of this State, by whom and for whose benefit they were created, in favor of the people of other neighboring and distant States, by establishing and exacting from the people of this State rates of freight and travel higher than those which they demand of the people of other States. And to such an extent has this discrimination against the people of this State been carried, that they have lost all the advantages of the admirable geographical position of their State, and have been, and are now compelled

to pay for travel and transportation of the produce, and for return freights, more for certain distances than the people of other States for greater distances; particularly have residents of the city of Macon, and interested in its prosperity, suffered from this policy. For not only have they discriminated against the people of Georgia in favor of the people of other States, but also against the city of Macon, and this section of the State, in favor of other sections which are more remote from the sea; and the city of Macon has actually been compelled, by this illiberal and illegal policy of discrimination against her and her citizens, to burthen herself with debt and her people with taxation, in efforts to free herself from the clutches of these two corporations, by opening other lines of railway, which these two corporations are attempting to break down, although in their own infancy they were materially aided by subscriptions of the city of Macon and of its citizens.

These two corporations were originally chartered for the benefit of all the people of this State, but have been and are now managed to the manifest injury of all the people of this State and the oppression of particular communities and sections of this State. This result has been reached by a manifest perversion of the purposes of their organization, and by palpable violations of their charters. These two corporations have subsidized all the lines of steamers running from New York to Savannah, with one exception, and are now controlling them for their own interest, and with the object to break down competing lines of railway, and have entered into contracts with said steamboat lines, by which said steamboat lines are bound, under heavy penalties, to refuse the transportation of freights which are not destined for their own roads, or for roads with which they are confederated.

With a full appreciation, for several years past, of the injuries which have been inflicted upon them and upon the people of this State, by the policy of these corporations, as illustrated by the facts hereinbefore stated, and with the conviction that this policy has involved repeated violation of the charters of these corporations, complainants have forborne a

resort to the Courts until satisfied by a recent transaction of these corporations, that nothing else is left them for the protection of their rights and the rights of the people of the State.

They refer to the purchase, by said corporations, of 12,383 shares of the capital stock of the Atlantic and Gulf Railroad Company, controlling and working the line of railway from Savannah to Bainbridge, in Decatur county, Georgia, the particulars of which may be gathered from the official copy of the report of the City Council of Savannah, and the agreement of said council with said corporations hereto appended, marked "Exhibit A." This purchase was illegal, and was before it was consummated, and before said stock was transferred, protested against formally in writing by George G. Hull, as a stockholder of the said Southwestern Railroad Company. Said purchase of stock is a violation of the charters of said corporations ; it is unauthorized by law, inasmuch as it is not "necessary to the purpose of their organization," or "for the legitimate execution of this purpose." Whatever party, whether William B. Hodgson, of the county of Chatham, or any other, was the nominal purchaser of said stock, the said Southwestern Railroad Company and the said Central Railroad and Banking Company were the real purchasers of said stock. The said two corporations, in the purchase of said stock, acted in concert and collusion, and the said purchase was the joint act of both. This purchase was made with the sinister and illegal purpose of controlling the management of the Atlantic and Gulf Railroad, so as to free the Southwestern Railroad from the competition of that road in freights and travel which inured to the benefit of the people of the State, and to prevent the use of the said Atlantic and Gulf Railroad from Doctortown to Savannah by the Macon and Brunswick Railroad, upon terms which would enable said Macon and Brunswick Railroad Company to compete successfully in freights and travel between Savannah and Macon with the said Central Railroad Company. The continuance of the competition which this purchase of stock was designed to remove, is a matter of vital interest to the

The Central Railroad Company *et al,. vs.* Collins *et al.*

people of the State, and especially to the city of Macon. A control of the Atlantic and Gulf Railroad, such as is designed by this purchase, contemplates discrimination against other railroads, and involves in such discrimination a plain violation of the charter of said Atlantic and Gulf Railroad Company. Said purchase of stock is illegal, because of the intention, as stated, with which it is made. If permitted, it will seriously impair the value of the large investment of the State of Georgia in said Atlantic and Gulf Railroad, inasmuch as said Atlantic and Gulf Railroad will be managed by means of the controlling interest in the stock of said Atlantic and Gulf Railroad Company owned by said corporations and their stockholders, in the interest and for the benefit of the said Southwestern Railroad Company and the said Central Railroad Company, instead of for the benefit of its corporators. Said purchase is injurious to their interests as such stockholders in the Southwestern Railroad Company, inasmuch as it materially affects the value of their stock, and endangers the franchises of the corporation in which said stock is held. This purchase of stock, under all the facts connected with it, is virtually a purchase of the charter, with all the rights, privileges and franchises of an independent railroad corporation, controlling a line of railway which is distinct, disconnected and distant from the lines of railway of the said Southwestern Railroad Company and the said Central Railroad Company, and was designed by the Legislature of Georgia for certain purposes of public interest and utility ; it is illegal, contrary to public policy, injurious to the interests of the people of the State and of the city of Macon, and of the stockholders of these corporations, and involves a perversion of the purpose of the Legislature, in organizing these three great railroad corporations, a misuser of the franchises of these corporations, and a violation of their charters. Said purchase was made at more than twice the market value of said stock, at Savannah, Georgia, where said purchase was made, and it was connected with other purchases of stock in other railroads, equally illegal and injudicious.

The Central Railroad Company *et al.*, *vs.* Collins *et al.*

They prayed that the said Southwestern Railroad Company, the President and each several Director thereof, and its Superintendent, and the said Central Railroad and Banking Company, and the President and Superintendent and each and every Director thereof, and the Atlantic and Gulf Railroad Company, by its President and every Director thereof, and its Superintendent, and the said William B. Hodgson, and the said city of Savannah, through its Mayor and Council, may answer especially various interrogatories as to their merchantile and business connections, their schedule of way and through freights, the cost and profits of transportation, as to the fact and purpose of said trade, etc.

And they prayed that the said Southwestern Railroad Company, and the said Central Railroad Company, and the said William B. Hodgson, be enjoined from the payment of the interest on said bonds of the said city of Savannah, to fall due, and from all further proceedings in the purchase of said stock, and the payment therefor and the control thereof; and that the said Southwestern Railroad Company, and the said Central Railroad and Banking Company, may be decreed to confine their action within the limits of their respective charters, and be forever prohibited from voting said stock and controlling the said Atlantic and Gulf Road in the interest of their monopoly, and to the detriment of the interests of complainants and of the people of Georgia, and that the Atlantic and Gulf Railroad Company be restrained and enjoined from the transfer of the said stock, or any part thereof, to the said Southwestern Railroad Company, or the said Central Railroad and Banking Company, or to them jointly, or to both or either of their Presidents, or to the said William B. Hodgson, or any one else for them, or either of them, and from taking any step looking thereto, and from allowing the said two last named companies or their Presidents, or either of them, or said William B. Hodgson, or any one else for them, or either of them, from voting the said stock, or any part of the same, or controlling it or any part thereof in any way; and that the said contract or contracts between the said railroad companies and the said

William B. Hodgson, of the one part, and said city of Savannah of the other part, be rescinded, and declared null and void; and that such other and further relief be granted, and the equities of all parties be settled in such manner as shall seem meet, and especially that stockholders in said Southwestern Railroad Company, may be protected from the unauthorized and illegal conduct of its directors and officers in the premises; that they, said officers, may be decreed to confine themselves to the exercise of their legitimate duties and powers under their charter of incorporation, and no further put to hazard the forfeiture thereof, and the ruin of the unoffending stockholders therein.

And to this end, that the books of the said railroad companies, showing all their contracts with other companies, their debits and credits therewith, in connection with purchases of stock therein and subsidies thereto; their rates of freight and contracts relating thereto; their obligations to transport only goods and produce carried over certain lines, and all their connections with other companies, and all the minutes and proceedings of their respective boards, be brought into Court for inspection and judgment in the premises, and that equity be done to all concerned, and that said Southwestern Railroad Company, and the said Central Railroad and Banking Company, through their respective officers, and the said city of Savannah, through her officers, the said Atlantic and Gulf Railroad Company, and the said William B. Hodgson, abstain and desist from all further steps to purchase and consummate their purchase and pay for the same, and pay interest on any bonds relating thereto, or from doing any act looking to the consummation of their effort to control the said Atlantic and Gulf Railroad Company, until further order, etc.

Exhibit A showed a copy of the proceedings of the Mayor and Council of Savannah, held December 23, 1868, when the Mayor stated that he had received a proposition to purchase the shares of stock held by the city in several railroad companies, to-wit: 12,383 shares in the Atlantic and Gulf Railroad Company; 307 shares in the Montgomery and

West-Point Railroad Company; 424 shares in the Augusta and Savannah Railroad Company, and one share in the Southwestern Railroad Company, for which bonds had been issued by the city.    The Southwestern Railroad Company, with the guarantee of the Central Railroad Company, offered to take these stocks and pay the bonds of the city at maturity, and the semi-annual interest on the same, as follows:    Atlantic and Gulf Railroad Company (due in twenty years) $944,000 00, Southwestern Railroad Company (due in one year) $117 00, Augusta and Savannah Railroad Company (due in two years) $174,500 00.

A. R. Lawton, Esq., representing the joint corporations, submitted to Council papers signifying the acceptance of said company, with the guarantee of the Central Railroad Company, for the performance of the contract, which were, on motion, ordered to be spread on the minutes of Council.    In these papers the Southwestern Railroad Company said : "Whereas, certain propositions made to William B. Hodgson, Esq., by the City Council of Savannah, for the transfer of its stock in the Atlantic and Gulf, Montgomery and West-Point, Augusta and Savannah, and Southwestern Railroad Companies, upon terms and conditions therein named, has been submitted for the consideration of this Board ; and whereas, the consummation of those propositions contemplate an amicable and just settlement of the present unhappy and ruinous competition on the part of the Atlantic and Gulf Road for business legitimately belonging to the Southwestern and Central Railroads ;

Now, therefore, relying upon the good faith of the city of Savannah to protect as far as possible the investments already made in the great channels of commerce terminating at the port of Savannah, by refraining from fostering other competing lines, and for the purpose of rendering the lines now in existence not only self-sustaining but profitable—disclaiming all antagonistic feeling, and desiring to contribute, as far as possible, to the commercial wealth and prosperity of Savannah, be it

*Resolved*, That this company will undertake to give the

guarantee required by the propositions from the City Council of Savannah and accepted on the part of William B. Hodgson, Esq., for himself and others.

*Resolved*, That the President of this company be and he is hereby fully authorized and empowered to execute the necessary papers to carry out the propositions made to William B. Hodgson, Esq., by the City Council of Savannah, for the transfer of its stocks referred to in the foregoing preamble and resolution, either as those propositions now stand or as they may be modified and agreed to by him.

*Resolved*, That inasmuch as the City Council of Savannah requires the endorsement of this company's guarantee, by some other corporation acceptable to the City Council, for the payment of the interest and principal of the city bonds, in consideration for the stocks to be transferred, and in view of the greater interests of the Central Railroad and Banking Company of Georgia in the settlement of conflicting railroad interests, terminating at Savannah, a committee, consisting of the President of this company, Gen. A. R. Lawton and Virgil Powers, are hereby appointed to confer with the Board of Directors of the Central Railroad and Banking Company of Georgia, and invite that company to join with the Southwestern Railroad Company, upon just and equitable terms in the guarantee to the city of Savannah for the payment of the interest and principal at maturity of the bonds, in consideration for the stocks proposed to be transferred."

And the Central Railroad and Banking Company of Georgia, authorized William B. Hodgson, Esq., and Gen. A. R. Lawton, to notify the Mayor and Aldermen of the city of Savannah of the readiness of said company to join the Southwestern Railroad Company in the guarantee of payment of the interest and principal, at maturity, of the bonds of the city of Savannah, as indicated in said proposition.

\*    \*    \*    \*    \*    \*    \*    \*    \*

At the conclusion of this important negotiation, Hodgson made a written speech in which he said : "This enterprise is conceived in opposition to none, but in good will to all. Especially do we intend that it shall promote the interests of Sa-

vannah.   With this candid expression of our views and in-
tentions, we consider this a fitting occasion to say to the citi-
zens of Savannah, that we rely on their good will and sup-
port in carrying out our present engagement.   We do hope
and expect that, pending the fulfillment of our obligations,
the city of Savannah will not contribute new aid to any rail-
roads which shall have the effect of injuring the present es-
tablished system of railroads now in beneficial and successful
operation.   Our guarantor being a railroad company, it is
proper, just and legitimate that we should ask this support
for it," and asked that this statement be attached to the papers
of the negotiation.

The following resolution was then unanimously adopted :

"*Resolved*, That the proposition now submitted for the
transfer of certain stocks on conditions named, be accepted
and hereby confirmed, and that the Finance Committee be
authorized to have the necessary legal papers drawn, and the
Mayor be hereby instructed to sign the same and perfect the
transfer.   But it is now distinctly understood that the city
is not bound by its action to refrain from aiding any other
lines of railroad that it may deem worthy of such support.

  *  *  *  *  *  *"

Exhibit B was the protest of Hull addressed to Holt as
President of the Southwestern Railroad Company, in behalf
of himself and other stockholders, against said trade upon the
ground that "said arrangement will prove most injurious to
the stockholders of said Southwestern Railroad Company and
their property; that the President and Directors of said com-
pany have no authority to make any such purchase, or give
any such guarantee, and that the same is in plain violation of
the charter of the company."

On motion of Judge Lochrane, representing the Attorney
General, the State of Georgia became a party complainant.

Judge Cole ordered that the State's writs of injunction and
subpœna issue as prayed for, in the penal sum of fifty thou-
sand dollars, restraining the defendants as prayed for in said
bill, &c.

*Answer of the Central Railroad and Banking Company.*

This defendant admits that the sale of certain shares of railroad stock by the Mayor and Aldermen of Savannah was effected in the manner and for the consideration set forth in "Exhibit A," attached to complainant's bill; and was actually made to the Presidents of the Central Railroad and Banking Company of Georgia, and of the Southwestern Railroad Company jointly; the written guarantee of the payment of principal and interest of the bonds therein named, by said two railroad companies, was executed and delivered to the constituted authorities of the city of Savannah, and the whole transaction was closed, before the writ of injunction was issued. This defendant had a perfect right to make such purchases, and to exercise all necessary and proper acts of ownership over said shares when so purchased, and it is not forbidden or restrained by the Act of Incorporation from which it derives its existence, nor by any Acts amendatory thereof, nor by the laws of the State of Georgia, from purchasing, holding, or disposing of such shares, or any like property. But this defendant distinctly denies that it was actuated in joining the Southwestern Railroad Company in the guarantee required by the city of Savannah, and finally in becoming interested in the purchase of said shares of stock, by any such motives as are attributed to it in complainants' said bill, or that it attempted to secure any object or accomplish any result which did not attach legitimately to the rights and duties to be exercised and performed by it in accepting the charter granted by the State of Georgia. This defendant distinctly denies that it has exercised, or attempted to exercise, any control whatever over other railroads, or over lines of steamships, except by such means, and to such extent, as were legitimate and proper in the discharge of its duties to its stockholders, to the State of Georgia, and the public; and has only attempted to cultivate such influences and such connections as would tend to enlarge and extend trade, transportation and travel in and through the State of Georgia.

This defendant denies that it controls, or ever has control-

The Central Railroad Company *et al.*, *vs.* Collins *et al.*

led the organization of the Southwestern Railroad Company, or that it has exercised, or attempted to exercise, any other influence over said company than such as naturally spring from the mutual interests of two important connecting lines, looking to the benefits to be derived by their respective stockholders, and by the people of the State which called them into existence, and fixed their rights and duties at the time of their creation. This defendant, answering the special interrogatories of complainants' bill, numbered from 1 to 42 inclusive, saith:

1. That this defendant has not subscribed to, and does not control continuous lines of railways from the city of Savannah to the western line of Alabama.

2. This defendant has no expectation of being able to control the lines of railway to the city of Vicksburg; but does hope to secure a fair share of freight and travel to and from that important and productive region for the benefit of Georgia capital and a Georgia seaport.

3. This defendant does not aspire to the "monopoly of the western or other trade," and has made no arrangements, and contemplates none, which will accomplish that end; but has given aid by the use of its credit, upon proper security taken, to several railroad companies which connect the road of this defendant, with the West (as fully set forth in the published report of the Directors to the stockholders, dated December, 1868, hereto attached as "Exhibit A,") for the purpose of securing trade and travel to its road, and at the same time to the people of Georgia the most favorable arrangements for obtaining supplies from the great West.

4. The control of this defendant extends no further West than the interior terminus of its own road, at Macon; but it ventures the hope that its legitimate influence extends to all the roads with which it has business, and that its stockholders, and the people of Georgia, received the benefit thereof.

5. It has expended no money, but has assisted by its credit and by favorable arrangements for freight and travel, (as set forth in the report already referred to,) but has used no other means to accomplish the object.

6. No further means or expenditures for this purpose are contemplated.

7, 8, 9, 10, 11. This defendant, further answering, appends hereto schedules of freight and passage charged by the Central Railroad, and by said road in conjunction with the Southwestern Railroad, and the Macon and Western Railroad, to and from Savannah and Eufaula; to and from Montgomery and Savannah; to and from Albany and Savannah; to and from Atlanta and Savannah; to and from Macon and Savannah—marked "Exhibit B."

12. This defendant is unable to give the exact "cost of transportation" from the stations of its railway (and has no control over any other); or from these stations to New York, or the reverse; as the elements which enter into such a calculation are numerous, changeable, and very difficult to decide upon. The prices charged for transportation and travel over these distances are set forth in the schedules hereto attached. This defendant owns no interest in, nor does it control any line of steamers from New York to any other point.

13. This defendant has made no arrangements whatever with "lines of steamships plying between New York and Savannah, binding said steamships to transport only goods brought over its road, and those in confederation with it, and none other."

14. This defendant entered into an arrangement and contract with three lines of steamships plying between New York and Savannah, by which said steamships agreed to carry freight, under "through bills of lading," from the various points on its line of railroad, and connecting roads, each charging a "*pro rata*" in proportion to distance, estimating four miles by sea as equal to one by rail; said steamship lines binding themselves to furnish all the ships necessary to do all the business offering both ways, and to run "port against port," so as to ensure as cheap transportation to New York from the interior of Georgia, and other States west of it, through the port of Savannah, as through any other Atlantic seaport. But this defendant does not forbid said steamships to make the same favorable terms with any other line of railroad coming to the sea at Savannah.

15. This defendant is the owner of stock in several railroad companies—as set forth in the published report to the stockholders, hereto attached as an Exhibit—and also is jointly interested with the Southwestern Railroad Company, in the stock of the Atlantic and Gulf Railroad Company, Montgomery and West Point Railroad Company, Augusta and Savannah Railroad Company, and the Southwestern Railroad Company, to the extent, and in the manner set forth in the Exhibit attached to complainants' bill. This defendant owns no stock in any steamship company.

16. This defendant has neither made nor given any loans, aids, guarantees, or endorsements, or bonds, to any railroad or steamship line whatever, except in the manner hereinbefore referred to, and more especially set forth in the published "report" attached hereto as an Exhibit.

17, 18. This defendant, in conjunction with the Southwestern Railroad Company, has recently purchased stock in the Atlantic and Gulf Railroad Company, and other railroads, to the extent set forth in the "Exhibit" to complainants' bill, and has purchased no other stock whatever in that road or any other road.

19. There are no purchases, which this defendant has guaranteed, of stock in the Atlantic and Gulf Railroad, or any other road.

20. This defendant attaches hereto a copy of the agreement or contract recently made and entered into between the city of Savannah, of the one part, and the Central and Southwestern Railroads of the other part. Marked "Exhibit C."

21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31. This defendant, further answering, saith, (protesting that "motives" are not the proper subject of inquiry in this connection): It was induced to join the Southwestern Railroad in giving the guarantee required by the city of Savannah, and taking an interest in the stock of the Atlantic and Gulf Railroad, by the following considerations, and no other: A large amount of capital had been invested in the stock of the Central and Southwestern Railroads, and these roads found a line of transportation and travel from the ocean to the boundary of

the State of Georgia at Columbus, Eufaula, and Fort Gaines, at rates remunerative to these companies, and entirely fair to the people of Georgia; the business was conducted to the satisfaction of the communities concerned. A competion had recently sprung up from these Western points by means of steamboats on the Chattahoochee and Flint Rivers, running in connection with the Atlantic and Gulf Railroad, which, by carrying produce at rates ruinously low, was seriously injurious to both lines, and of no service to either. This defendant, in connection with the Southwestern Railroad, remonstrated with the Directors of the said Atlantic and Gulf Railroad, and endeavored in several conferences to, arrange the rates of freight so ·that the public could be served promptly and fairly, without ruin to the stockholders of either line. Failing in all these efforts, and regarding the course pursued by the Directors of the Atlantic and· Gulf Railroad as the policy of desperation, this defendant was willing· to become largely interested in the stock of said company, and thus have a right to confer with the stockholders of said road, and exercise such influence as would be legitimate in avoiding these disastrous results. This defendant firmly believed that a conservative policy would enable that company to relieve itself from embarrassment, raise the value of the stock so as to reach its par value by the time the bonds of the city óf Savannah (which this defendant joined in guaranteeing) should mature, and thus impose no burden upon the stockholders of the Central and Southwestern Railroads; and this defendant further answering saith, that results have thus far justified expectations.

Since the completion of the arrangements for the transfer of this stock, the market value of the Atlantic and Gulf stock has risen from about $37 00 to $50 00 per share, and of the Southwestern Railroad from $93 00 to $108 00 per share; and this defendant utterly denies that its object was to defeat the citizens of Macon and of the interior of Georgia, in their efforts to secure other outlets to the sea and to the city of Savannah, or to break down the Macon and Brunswick Railroad; indeed, this defendant avers that there is no char-

The Central Railroad Company *et al.*, *vs.* Collins *et al.*

ter in existence for any other railroad than the Central from Macon to Savannah.

32. This defendant absolutely denies that its President has ever avowed "that the Macon and Brunswick Railroad must not be built; cost what it might, at every hazard, it must be prevented," or has ever used words to that effect. But the said President has repeatedly said, and still believes, that said Macon and Brunswick Railroad ought not to be built, and is not called for by the interests of the people of Georgia, and can only be productive of injury to existing interests. Nor has he ever made any threat against it, nor claimed any powers to prevent its completion.

34. This defendant, further answering, saith it has no knowledge of the notice and protest, by the complainant, George G. Hull, to the Southwestern Railroad, except as it has casually heard of it from other parties.

35. No money has yet been paid on account of the principal and interest of the bonds of the city of Savannah, guaranteed by these companies, as no part has yet fallen due in terms of the said agreement.

36. William B. Hodgson, as this defendant is informed, did conduct the negotiation for, and on account of, the Southwestern Railroad, but this defendant had no notice or information of the pendency of such negotiation, nor of the result of the same, until all the details had been agreed upon, and this defendant was applied to, by the Southwestern Railroad, to join in the guarantee required by the city of Savannah.

38. There was no contract between this defendant and the said William B. Hodgson, and this defendant is informed, and believes, there was none between him and the Southwestern Railroad Company.

39. The written agreement, and contract hereto attached as an exhibit, contains all the details of the contract between the said railroad companies and the city of Savannah.

40. The order of events, as hereinbefore set forth, and the copy of the agreement with the city of Savannah, furnish all the information on the subject in the possession of this defendant.

41. The stock now owned by the two railroad companies named, in the Atlantic and Gulf Railroad Company, or in any manner under their control, does not constitute a majority of the stock in said Atlantic and Gulf Railroad.

42. This defendant has not made purchases of other stock, in other railroads, except as hereinbefore stated and set forth.

This defendant denies all manner of combination and confederacy charged, and prays to be hence dismissed with its reasonable costs and charges.

Exhibit C set out the contract made the 28th of December, 1868, between the city of Savannah, the Southwestern Railroad and Banking Company, and the Central Railroad and Banking Company, which stipulated as follows:

"First. The said party of the first part, for and in consideration of the agreements and covenants of the parties of the second part, to be by them kept as hereinafter recited, does herein and hereby agree and bind itself to sell, convey, and transfer to said parties of the second part the following shares of the capital stock of the railroad companies hereinafter named; that is to say, twelve thousand three hundred and eighty-three (12,383) shares of the capital stock of the Atlantic and Gulf Railroad, of the par value of one hundred dollars each, three hundred and seven (307) shares of the capital stock of the Montgomery and West-Point Railroad, of the par value of one hundred dollars each, four hundred and nineteen (419) shares of the capital stock of the Augusta and Savannah Railroad, of the par value of one hundred dollars each, and one share of the Southwestern Railroad, of the par value of one hundred dollars. And the said party of the first part does actually transfer said shares on the proper books of the respective railroad companies at the same time with the execution of these presents, to William M. Wadley, President, and William S. Holt, President, in accordance with the expressed wishes of the said parties of the second part.

"Second. The said the Central Railroad and Banking Company of Georgia, and the Southwestern Railroad Company, parties of the second part, in consideration of the premises

and of the transfer of said shares of railroad stock as afore-
said, do hereby agree to guarantee the payment of, and ac-
tually to pay the principal and interest to accrue and become
payable from and after the date of these presents, on certain
bonds issued and used by the said the Mayor and Aldermen of
the city of Savannah, for the subscription of the city of Sa-
vannah to said railroad companies; that is to say, bonds
issued for the Savannah, Albany and Gulf Railroad, now
Atlantic and Gulf Railroad, amounting to nine hundred and
forty-four thousand dollars ($944,000,) bonds issued for the
Southwestern Railroad Company, amounting to one hundred
and seventeen thousand dollars ($117,000,) bonds issued for
the Augusta and Waynesboro Railroad, now Augusta and
Savannah Railroad, amounting to one hundred and seventy-
four thousand dollars ($174,000,) or any bonds properly to
be issued in lieu of any of the foregoing bonds lost, mutila-
ted, or destroyed; said bonds to be paid, the principal sums
at or before the maturity of the same, and the interest at the
respective dates when the coupons thereto attached shall fall
due, a schedule of which said bonds, with the dates of their
issue, times of maturity, and of the falling due of the cou-
pons, is for greater certainty hereto attached, marked Sched-
ule "A," some of said bonds having already been issued in
lieu of bonds lost or mutilated.

"Third. It is mutually covenanted and agreed by and be-
tween the parties to these presents that the said parties of
the second part will deposit in the Central Railroad Bank,
in Savannah, or at such other suitable place as may be agreed
upon, subject to control of the City Treasurer of Savannah,
or other proper officer, on the day before each class of cou-
pons for interest shall fall due, the precise sum necessary to
pay off said coupons, and such fund shall be used for and ap-
plied to no other purpose whatever; and at the maturity of
any one of the classes of said bonds herein enumerated, the
said parties of the second part shall in like manner deposit
an amount of money sufficient for the payment of the princi-
pal and any unpaid interest due on the same, said money to
be used for the purpose of such payment and for no other

The Central Railroad Company *et al.*, *vs.* Collins *et al.*

purpose whatever. As a part of the foregoing agreement, it is hereby understood that the city of Savannah is to pay any accrued or accruing interest on bonds up to the first day of January, in the year eighteen hundred and sixty-nine.

*Bonds to be Assumed and Interest to be Paid.*

| ISSUE. | AMOUNT...... | WHEN DUE... | INTEREST. | | |
|---|---|---|---|---|---|
| | | | WHEN DUE. | AMOU'T PER ANNUM | FOR WHAT LENGTH OF TIME. |
| Atlantic and Gulf Railroad.......... | $940,500 00 | 1888 | 1st June and Dec. | $65,835 00 | 20 years, from 1869 to 1888, inclusive. |
| New Bonds given in lieu of lost*... | 3,500 00 | 1886 | 1st Jan'y and July. | 245 00 | 18 years, from 1869 to 1886, inclusive. |
| Southwest'n R. R | 117,000 00 | 1869 | 1st May and Nov. | 8,190 00 | 1 year, from 1869. |
| Augusta and Savannah Railroad | 174,000 00 | 1870 | 1st Feb'y and Aug. | 12.180 00 | 2 years, 1869 & 1870. |
| | $1,235,000 00 | | | $86,450 00 | |

*Nos. 509, 519, 520, 522, 523, 524, 525, at $500 each.

### Stock to be Transferred.

12,383 Shares Atlantic and Gulf Railroad Stock.
419 Shares Savannah and Augusta Railroad Stock.
307 Shares Montgomery and West-Point Railroad Stock.
1 Share Southwestern Railroad Stock.

13,110 Shares."

The Southwestern Railroad Company answered, claiming a right, under its charter, to make said trade, and saying the Central Railroad and Banking Company is a stockholder in the Southwestern Railroad Company to the extent of 4,856 shares, and to that extent, and in no other way, contributed to the building and equipment of the Southwestern Railroad, just as other shareholders, proportionably to the amount of shares held by them. It further answered as follows:

They denied that the Central Railroad and Banking Company had for a series of years, or any number of years, or any length of time, absolutely controlled the organization and management of the Southwestern Railroad Company, either from the large amount of the capital stock thereof held by the Central Road, owned by it or its stockholders, or by the large interest which it has in other and connecting railroads,

or otherwise. They said the Southwestern and Central Railroad and Banking Company have usually, heretofore, acted in perfect harmony and concert with each other, because their interests were, and are, the same; there is no cause of conflict between them, nor has there ever been, but the said Southwestern and Central Railroads have not illegally or otherwise combined and confederated together to break down all or any competing lines of railway, or to monopolize, as far as possible, the railroad transportation of the State. As their organization was for the purpose of carrying freights and passengers for the tolls or profits to the stockholders, they have always been anxious to secure as much freight and travel for their respective roads as they could without infringing their chartered rights or the law; but they have not felt the necessity, nor would they enter into any illegal combination or confederation for that purpose.

They denied having discriminated against the people of this State by establishing and exacting from them rates of freight and travel higher than those demanded of the people of other States; in carrying freights which are brought to their roads from other and connecting lines of transportation from great distances, it is usual and customary, if not the universal practice, for all lines of transportation, and this road, to charge less toll, or rate of freight, than on local freights or travel; and this is done solely to induce freight and travel over this and other roads in like situation, rather than to take other and competing lines of transportation to other places and markets; but such arrangements as this is not a discrimination against local freight or travel; it is done to increase, by legitimate means, the legitimate freight and travel and business of the road, and results advantageously to the local-freight and travel, for by the increased business of the road thus legitimately acquired, it is able to do the local business at much less rates than if such local business was the only source of income. These defendants deny that the people of the State of Georgia, or of the city of Macon, have, by any act of these defendants, lost any or all advan-

tages of the admirable geographical position of their State and city ; but, on the contrary, by the organization and equipment of the Southwestern Railroad, and the use thereof by these defendants, all the people in Georgia in reach thereof have been enabled to get their produce and freights to and from the markets within and out of the State of Georgia in much less time, and at much less cost, than they had been able to do before.   They have brought within, through and to the markets and ports of the State of Georgia business, produce and trade and travel that never came to it before, but which went by other means of transportation to other markets, other ports and by other lines of transportation out of the State.   They deny that they have discriminated against, or injured the city of Macon or its citizens by any arrangement whatever; on the contrary, by the facilities and means of transportation furnished by them, they have brought to the city of Macon an immense patronage in the way of produce, freight, trade and travel, that it never had, and could not have obtained but for the Southwestern Railroad Company.

They did not know to what extent the city of Macon had "burthened" herself with debt by opening other lines of railway, or what her purpose was in so doing ; but they do most positively deny that these defendants, or the Southwestern Railroad, is attempting, or has ever attempted, to break down any other railroad whatever.   They cannot state to what extent the city of Macon aided in building the Southwestern Railroad by subscription to its stock, but they do not believe it subscribed a single share ; nor did citizens of Macon take any stock in said road at its beginning, other than those of said citizens who were at the time largely interested in the success of the road otherwise, to-wit : as contractors ; nor has the city of Macon or its citizens aided by subscription to the stock or otherwise in the extension of the road.

They deny that the continuance of competition is a matter of vital importance to the people of the State and especially to the city of Macon ;" they deny that the control of the Atlantic and Gulf Railroad is designed by this purchase.

They deny that this purchase will, "seriously" or otherwise, "impair the large investment of the State of Georgia in the Atlantic and Gulf Railroad." On the contrary, it has benefitted, and will largely appreciate and render more valuable the State's investment in said road, by increasing the value of the stock in said road, generally, by paying dividends thereon, which it has not done up to this time. It is the design of the defendants, so far as they can legitimately do so, to enhance the value of said road, and not to destroy its stock or impair its value.

The purchase of said stock is not injurious to the complainants as stockholders in the Southwestern Railroad ; said purchase does not diminish the value of their stock, nor endanger the franchise in which said stock is held.

They deny that this purchase of stock, "under" any or "all the facts connected with it, is virtually a purchase of the charter, with all the rights, privileges and franchises of an independent railroad corporation, controlling a line of railway which is distinct, independent and distant from the lines of railway of the said Southwestern Railroad Company and the Central Railroad Company." On the contrary, that purchase will inure to the benefit of the people of the State, the city of Macon and the stockholders of all the corporations involved in it. The only persons whose interests will be affected by the purchase are those few persons and citizens of this State residing on the border limits of the State of Georgia and near the termination of the two railroads, and the people of the neighboring States in that vicinity, and they will only be affected, not injured, by failing to get their freight and travel over said roads, from the extreme points, for less *than the actual cost thereof*, on account of the rivalry that might exist between the two roads at those border and extreme points.

Said stock was purchased at a much higher price than the market value of said stock at the time, in the market, but the price paid, or rather the liability assumed on account thereof, was given because the city of Savannah would not dispose of it on any other terms, and the other stock, as stated in "Ex-

hibit A and B," to complainant's bill, was purchased because they could not purchase one interest without buying all.

George G. Hull, as a stockholder in the Southwestern Railroad, protested against the consummation of the purchase of said stock in the Atlantic and Gulf Railroad before the same was consummated.

Said purchase was the joint act of both the Central and Southwestern Railroads, and the transfer of stock contemplated thereby, was actually made to the Presidents of the Central Railroad and Banking Company, and óf the Southwestern Railroad Company jointly, and the written guarantee of the payment of principal and interest of the bonds therein named by said two railroad companies was executed and delivered to the constituted authorities of the city of Savannah and the whole transaction was fully closed up before this injunction was issued.

Stephen Collins and James A. Nisbet, two of the complainants, are stockholders in the Southwestern Railroad Company. One of them, to-wit: Stephen Collins, holds thirty shares; the other, James A. Nisbet, twenty-five shares; and both are citizens of the State of Georgia, and one of them, to-wit: Stephen Collins, a citizen of Macon; but neither of them hold any of said shares in said railroad in their own right, or have any actual personal interest therein, but the stock represented by them is held by them as trustees for other persons.

Peter Solomon, another of said complainants, is a stockholder in said Southwestern Railroad to the amount of twenty-five shares, in his own right, and is a citizen of the State of Georgia, but not of the city of Macon.

George G. Hull, the only other complainant named in said bill, is the owner of fifteen shares in the Southwestern Railroad; he is not a citizen of the State of Georgia, but of the State of New York.

All of said complainants named in said bill are largely interested in the building, completion and success of the Macon and Brunswick Railroad, and its establishment as a successful competing railroad of the Central Railroad and

Banking Company, in the carrying of freight and travel between the cities of Macon and Savannah; the interest of said complainants in the Macon and Brunswick Railroad, either as stockholders in, or contractors on said road, is so much greater and so largely overbalances the actual or fiduciary interest, they and each of them have in the Southwestern Railroad, that the loss or total destruction of their respective interests as stockholders in the Southwestern Railroad would be of the most decided pecuniary benefit to them, if thereby they could secure the success of the Macon and Brunswick Railroad as a successful competitor of the Central Railroad and Banking Company.

George G. Hull, one of said complainants, is not only largely interested, as aforesaid, in the completion of the Macon and Brunswick Railroad, and its active operations as a competitor, as aforesaid, with the Central Railroad, as a large contractor, in the building of said road, but also as the active agent of Dabney, Morgan & Company, and a large number of other persons associated with them, all of whom are reputed to be large capitalists and heavy stock operators and speculators, residents and citizens of the city of New York, to and with whom the President and Directors of the Macon and Brunswick Railroad Company have contracted, that the said persons so associated as aforesaid, and of whom the said George G. Hull is agent, as aforesaid, shall complete and equip the said Macon and Brunswick Railroad in running order; and for which service so to be performed by them the said Macon and Brunswick Railroad has agreed to transfer to said persons so associated, as aforesaid, *fifteen hundred thousand dollars*, in preferred guaranteed eight per cent. stock of the Macon and Brunswick Railroad, together with, and in addition to, *one million five hundred thousand dollars* of the bonds of said company, to be endorsed by the State of Georgia, under an Act of its Legislature passed for the purpose of authorizing said endorsement, and the further sum of *one million dollars*, in the bonds of said company, without the endorsement of the State of Georgia.

And the bill of complainants against these defendants is

filed and presented by said complainants, in the interest of, and for the benefit of, the said Macon and Brunswick Railroad Company, and the said persons and companies, so associated and contracting together as aforesaid, and for the purpose aforesaid, and they are residents and citizens of the State of New York, and not of the State of Georgia. And said complainants have allowed said parties the use of their names as complainants for that purpose, and not to protect their interest as stockholders in the Southwestern Railroad from any supposed injury that might result to them, or that interest, by the purchase of stock in the Atlantic and Gulf Railroad Company, because, their information is that said Dabney, Morgan & Company, and others associated with them as aforesaid, for the purposes aforesaid, are paying the whole expenses of the filing and prosecution of said bill and the litigation attendant upon the same, and have agreed to save said named complainants harmless from all loss or expense whatever on account of the same.

These defendants deny, the right of said complainants to bring said bill into the Court in behalf of these defendants, who are stockholders in said road and citizens of the State of Georgia, or as against all others of the stockholders in said Southwestern Railroad, who have participated in the purchase of the stock in the Atlantic and Gulf Railroad, who have ratified, approved and acquiesced in said purchase, constituting as they do the great body of the stockholders in said railroad, and controlling an overwhelming majority of the same. And these defendants here now most solemnly protest against the further prosecution of said bill of complaint against them, on their own behalf, and on behalf of all others of said stockholders of the Southwestern Railroad who have participated with these defendants in the act complained of.

These defendants were elected under and by virtue of the charter of said railroad, by the votes of the stockholders thereof, to manage, control and direct said railroad, and were vested with discretionary powers by the charter to act for the shareholders for the general interest of the company, and in the

exercise of such discretionary powers, purchased this stock in the Atlantic and Gulf Railroad in furtherance of that interest, and as auxiliary to the great objects of the organization, as a measure of self-preservation, and said complainants and all other shareholders are bound thereby under the charter; under the charter it is a question among themselves, and their redress for any supposed grievance to them or their interest in this respect, is by a call of the shareholders and taking their voice upon it; the complainants and all other stockholders of said Southwestern Railroad Company took their stock and became members of said company, subject to these conditions, powers and modes of redress.

The Southwestern Railroad Company is a private corporation under a grant from the State of Georgia, before stated, organized, built, equipped and put in successful operation, by the energy, labor and capital of the stockholders thereof, without the aid of *one dollar* from the State of Georgia or any of the public coffers, and the same is managed, controlled and used by these defendants for the benefit and profit of its stockholders, in conformity to the powers conferred upon them by its charter for that purpose. And whether they have abused their powers, or exercised any authority in violation of law or the public interests, is a question for them and the State of Georgia through its legitimate representatives; and they submit whether their operations are to be questioned, arraigned, impeded and interfered with, to the great prejudice of the company's interest, at the capricious or intrusive demand of any and every individual member of the community, for any supposed conflict between their actions and operations and the public interests, to further their own love of litigious strife, or some individual and antagonistic scheme of their own, and when no individual interest has been violated, or personal pecuniary loss sustained, except such as grow out of their voluntary contract. In the matter of toll, the whole question, either as to freight or travel, has been left *by the charter* to the absolute uncontrolled discretion of the Board of Directors of said Southwestern Railroad Company.

In response to the various charges in complainants' bill, as to monopolizing the trade and travel in violation of the charter of said Southwestern Railroad Company; as to a perversion of the purposes of the grant of its charter, the organization of the road under it, and the use thereof by these defendants without regard and in hostility to the interests of the public, of the people of Georgia, and particularly to the citizens of Macon—these defendants deny the whole and every part of said charges, not only as made, but in fact, in letter or spirit, in every form or sense in which they may or have been used.    And although the rate of tolls on freight and travel over and on said Southwestern Railroad, by its charter is vested in the President and Directors, and left to the absolute and uncontrolled discretion of these defendants, and was one of the terms and conditions on which the grant was made by the State of Georgia, and accepted by the corporators thereof, and on the faith of which the stockholders therein subscribed for the stock and invested their capital, labor and enterprise therein, these defendants have not and are not now exercising said power for their own benefit, to the injury of the best interests of the people of Georgia or any portion thereof.    On the contrary, these defendants, in the exercise of their discretion, in the regulation and assessment of tolls on freight and travel, have been governed by a sincere desire, and have done all acts with the intent, to induce the largest amount of trade and travel over their line of railway, and at as low rates as possible to the people of Georgia, and as at the same time to yield fair, just and reasonable dividends, to the stockholders thereof, on their investment in said railroad; and while said road, since its organization and completion, has constantly adapted itself to the wants and convenience of the people of the State of Georgia within its reach, by carrying all freight and passengers at such rates as would be beneficial to the public and at the same time pay dividends, it has never unjustly or illegally discriminated against any person or place.    Said road has never done more at any time than pay reasonable and just dividends on the capital invested, and in many instances has failed to pay any

dividends at all, and without the accumulation of any surplus on hand for distribution or otherwise.

The purpose of the Legislature of the State in the grant of the charter of the Southwestern Railroad Company, as expressed therein, was, "to open a railroad communication between the city of Macon and the navigable waters of the Gulf of Mexico," and the grant thereof was made to the corporators to effect that object; and to induce its acceptance and promote that desirable end, the powers and privileges stated in the charter were conferred on said corporation. Said corporation, in the utmost good faith, accepted the terms and accomplished the purposes of the Legislature without any aid from the State or from the people of the State, other than as stockholders who invested their capital therein. And after the said Southwestern Railroad Company had completed their enterprise, by successfully tapping the navigable waters of the Gulf of Mexico and turning its tide of freight and travel across and through the State of Georgia, and benefitting particularly the city of Macon, another railroad was built from the city of Savannah along the extreme Southern border of the State of Georgia to the town of Bainbridge, on Flint River, a part of the navigable waters of the Gulf of Mexico, already tapped as aforesaid by the said Southwestern Railroad, and thus connected said new road with the trade and travel, the benefit of which was the great inducement to the organization, building, and completion of the said Southwestern Railroad, and the investment of their capital therein by its stockholders, all of which was held out to them by the grant of their charter. And when said railroad was thus finished without interference or protest by these defendants or either of them, or by the stockholders—although it was expressly stipulated in the charter of the Atlantic and Gulf Railroad that the rights, privileges and franchises thereby granted should, in no wise, interfere with the chartered rights of the Southwestern Railroad—the said Atlantic and Gulf Railroad, instead of competing fairly and justly with the Southwestern Railroad in the transportation of freights and passengers at fair and remunerative terms,

commenced a system of most ruinous rivalry by connecting itself, at an enormous outlay of money, and at great loss, with lines of steamboats from Bainbridge up and down the Flint and Chattahoochee Rivers, and carrying freight and travel from all points on said rivers touched by said Southwestern Road, at rates of toll far below the actual cost of transportation, thus involving its own ultimate ruin as well as that of the Southwestern Road; and by so doing, took the trade and travel away from Macon and the centre of the State, and carried it along the Southern part of Georgia to the city of Savannah ; which policy of the Atlantic and Gulf Railroad was persisted in until, by such unwise and suicidal course, the trade and travel of the Southwestern Railroad was greatly diminished, its profits completely cut off, its stock depreciated in the markets from 110 to 93, while the Atlantic and Gulf Railroad, at the same time, was not paying dividends at all, and its stock constantly and rapidly running down to a ruinous figure in the markets; in fact, so low that the Comptroller General of the State, in his report to the Legislature, estimated the State's ten -thousand shares of its stock as only worth ($350,000) *three hundred and fifty thousand dollars !* With a continuation of such rivalry the ruin of both roads, and the striking out of their large capital, with the consequent ruin of the stockholders, and loss of *one million dollars* to the State, was not only probably, but inevitable. Under these circumstances these defendants, in the exercise of the discretionary powers conferred upon them by the charter, and to subserve, promote and carry out the best interests of said railroad company, and *all* the stockholders thereof, purchased the stock in said Atlantic and Gulf Railroad, from the city of Savannah as aforesaid, not for the purpose of destroying a rival road, nor to avoid a fair and just competition in the trade and travel from and to the points where the said two roads came in conflict, but by the control of such interest in said Atlantic and Gulf Railroad, to induce its managers and directors to adopt a different and wiser policy in the management of the same, by the assessment of such rates of toll on the freight and travel as would be but

fair, and reasonable, and just compensation for the same, without detriment to the rights or interests of the public or people, and thus, without any violation of law, or any act of bad faith, to preserve and protect both roads from great loss, if not total destruction. It was with this intent, and for this purpose alone, that said purchase was made, as an act of *self-preservation*, and with no other intent, purpose or object, whatever.

Their answers to the special interrogations of the bill are not material.

The answer of the Atlantic and Gulf Railroad Company showed that its stock was thirty-six thousand nine hundred and twelve shares, showing that said shares in this company, bought from the city of Savannah, is seventy-nine shares in excess of one-third of said stock. It admitted that on the 12th of September, 1868, it did enter into a contract for through freights with a certain steamship line to monopolize its carrying power, because certain other specified lines had refused to contract with this defendant for transportation of through freights to the West within such limits as would compete with the Central Railroad and Banking Company and the Southwestern Railroad Company. It denied any knowledge of, or connection with, the other matters charged in the bill.

The answer of the Mayor and Aldermen of Savannah admitted said trade; said they made it for the good of the city, because it was in debt, etc.; they believed that their co-contractors had a right to buy and guarantee, and if they had not, they had a right to sell and should be allowed to exercise it; especially, if said contract was *ultra vires* of said co-contractors, this defendant was ignorant of that fact. And besides, $117,000 00 of the bonds, the payment of which said co-contractors had assumed, were issued by the Mayor and Aldermen of Savannah to aid in the construction of the Southwestern Railroad and were endorsed by the Southwestern Railroad Company when they were issued. These bonds will mature on the 1st of November, 1869.

Upon these answers and exhibits defendant's solicitors

moved to dissolve said injunction upon the ground that there was no equity in the bill, or if there was it was sworn off.

Judge Cole held that there was no equity in the bill, that any stockholder of a railroad company might enjoin it from a misapplication or perversion of its funds or credit, though sanctioned by a majority of its stockholders; that the Southwestern Railroad Company had no right to purchase stock in other railroads or to use its money or credit for anything but to build, equip and maintain their road; that the ignorance of the Mayor and Aldermen of Savannah was not material; they loose nothing; for if the contract was void they retain the stock.

(This case being one of special public importance and the State being an extra party, two hours extra were allowed for argument.)

LYON, DEGRAFFENRIED & IRVIN, JACKSON, LAWTON & BASSINGER, HARTRIDGE & CHISOLM, HARDEN & LEVY, JOHNSON & MONTGOMERY, for plaintiffs in error, said corporations may purchase unless *restrained* by their charters : Ang. & A. on Corp., sec. 155, etc.; Grant on Cor., 107; 3 Rand. R., 141. The contract "must be wholly aside of the general object of the incorporation :" Redf. on R. R., 490; 35th Eng. L. & E. R., 9; 30th, 120, *et seq.*, and this right is liberally construed to affect a legal purpose : 3 Rand. R., 136, *et seq*; as to "public policy," see sec. 2708 Irw. Code; 2 Story's Eq. Juris., sec. 259, etc.; Chitty on Corp., 663. *Ultra vires* not necessarily void : 22 N. Y. R., 258; stockholders may call directors to account but contract stands : 30th and 35th Eng. L. & E., *supra;* the State only can complain : Ang. & A. on Corp., sec. 777; 3 Rand. R., 136, *et seq;* as to freights and tolls see 93d E. C. L., 63; 94th, 365; if S. W. R. R. could not so trade the C. R. R. & B. Co. could under its charter and is therefore bound, though the S. W. R. R. Co. may not be : 5 John. R., 162; 1 Peck. R., 500; 8 Cowen R., 168; Story on Prom. Notes, secs. 99, 425 and Note 428; 1 Parsons on Con., 25 and 26; 13th Mass. R., 151; the trade is good so far as the city is concerned; 7 Serg.

& R., 313; 14th Peter's R., 122; 1 Doug. (Mich.) 401; 3 Rand. R., 140; the charter may be forfeited if abused, but contract is good: 16th Mass. R., 101–2; 9th Ib., 423; 8 S. & M., 173; 8 Wheat., 355; 1 Rich. L. R. (S. C.) 288; 4 John. Ch. R., 370; 16 S. & R., 144; 14th Geo. R., 327; 6th, 156; 13th S. and M., 411; if this bill is for rival companies it is bad: 19 E. L. & E., 14.

WHITTLE & GUSTIN, R. TOOMBS, NESBITS & JACKSON, W. H. HULL, I. L. HARRIS, O. A. LOCHRANE, for defendants, said these corporations can do nothing not allowed by their charters: 2 Kent, 298; 2 Cranch., 167; 4 Wheat., 686; 13 Peters, 587; 4 Wheat., 418; 2 Cowen, 664, 709; 3 Wend., 482; 1 Kelly, 533; 5th, 561; 7th, 224; 8th, 23; 9th, 213; 11th, 438; 25th, 610; any stockholder may complain: Grant on Corp., 301, 302; 10th Beavan, 1; 2 R. & M., 483; 3 Eng. L. & Eq., 150; 16th, 182; 73 E. C. L., 73; Collyer, 376; 2 Russ., 501; the policy of the State must be gathered from the law and the State gave all rights which she intended defendants to exercise: Pierce on R. R., 398; 12 Beavan, 352; 30 Eng. L. & E., 143; 7th Eng. L. & Eq., 505; 16th, 180; 12th, 224; 73 E. C. L. R., 811, 814.

McCAY, J.

This is a bill filed by certain stockholders in the Central Railroad, certain stockholders in the Southwestern Railroad, and certain other persons who claim to come before the Court as *citizens* of the State of Georgia, and as such to be interested in the relief sought by the bill.

The substance of the charges is, that the Central Railroad and Banking Company, and the Southwestern Railroad Company, the former chartered to build and maintain a Railroad from Savannah to Macon, and the latter chartered to build and maintain a Railroad from Macon to the Chattahoochee River, are about to purchase from the city of Savannah, certain stock, including twelve thousand three hundred and eighty-three shares in the Atlantic and Gulf Railroad Company, a company chartered to build a Rail-

road from Savannah to Bainbridge, with the intent and purpose on the part of these two companies to use the stock thus purchased to affect the management of the Atlantic and Gulf Road.

The answers admit, in substance, the charges; but the injunction is sought to be dissolved on the ground that there are not proper parties to the bill, and on the further ground, that said Central Railroad and Banking Company, and Southwestern Railroad Company, have a right under their charters to make such a purchase.

There are, it is true, some other points made in the demurrer and motion to dissolve, but in the view taken of the case by the majority of the Court, these are the essential questions.

1. Upon the question of parties, we agree that the citizens, in their character as such, are not proper parties to *this* proceeding. The State as one of the stockholders of the Atlantic and Gulf Road is a proper party; but the simple citizen, who has no other interest, has not, as it seems to us, any rights in this controversy. This is a simple attempt to enjoin the making of a certain contract, a mere private suit, in which no one has a right to be heard, that is not interested in the decree. The wrong done the public by the alleged violation of the charter cannot be reached in this proceeding except so far as it affects the interest of those whose pecuniary rights are affected by the proposed contract.

But, the stockholders in the Central and Southwestern Railroad Companies, and the Atlantic and Gulf Road and its stockholders, are proper parties. The former allege that this contract is a violation of their rights under the several charters, and the latter that it is injurious to its rights that these two rival roads should be permitted to acquire so controlling an interest in the management of its road. As this ground of the motion to dissolve is in the nature of a general demurrer, to be good, it ought to show there are no proper parties to the bill.

2. We think the stockholders of the several roads are proper parties, have a good cause of complaint, and we therefore think the Court did right to overrule the motion on this ground.

The Central Railroad Company *et al.*, *vs.* Collins *et al.*

We do not think the profitableness of this contract, to the stockholders of the Central and Southwestern Railroad stockholders, has anything to do with the matter. These stockholders have a *right*, at their pleasure, to stand on their contract. If the charters do not give to these companies the *right* to go into this new exterprise, any one stockholder has a right to object. He is not to be forced into an enterprise not included in the charter.

That it will be to his interest is no excuse; that is for him to judge. By becoming a stockholder he has contracted that a majority of the stockholders shall manage the affairs of the company within its proper sphere as a corporation, but no further; and any attempt to use the funds, or pledge the credit of the company not within the legitimate scope of the charter, is a violation of the contract which the stockholders have made with each other, and of the *rights—the contract* rights—of any stockholder who chooses to say, "I am not willing." It may be that it will be to his advantage, but he may no think so, and he has a legal right to insist upon it that the company shall keep within the powers granted to it by the charter: 1 Shelford on Railways, 71; 1 My. & K., 162–3; 4 Y. & Coll., 618; 2 Dan. P. C., 521; 5 Hill, 386; 18 Barbour, 318; 43 N. Hamp., 525; 6 Angel & Ames on Corp., 4th edition, and cases cited.

3. The real question in this case is as to the *power* of these two companies under their charters, each of which defines the object of the incorporation to undertake the management of not only a wholly new enterprise from that set forth in the charter, but an enterprise chartered by the Legislature evidently in rivalry with these two roads.

In the argument of this case it was almost admitted that such a contract was expressly forbidden by the charter of the Southwestern Railroad. That charter contains these words, after defining the object of the company, to-wit: to build a road from Macon to the Chattahoochee: "The said company shall *confine* their efforts and their enterprise to the building and completion of a railroad communication from the city of Macon to some point intermediate

between Albany and Fort Gaines," etc., etc.: Acts, 1845, pamphlet 132. Surely it cannot be contended that the management and control of the Atlantic and Gulf Railroad is in harmony with *this* clause of the charter. As we shall show hereafter, even without these words the power would not exist, but the Legislature seems to have been more than ordinarily cautious, and, to make assurance doubly sure, has in express terms limited the right of the *Southwestern Railroad Company* to use its means for purposes other than those for which the charter was expressly given. The great question in the case is, therefore, the right of the Central Road to make this purchase. As the injunction might be sustained in favor of the stockholders of the Southwestern Railroad Company, yet if the city and the Central Railroad Company desire to consummate the trade, leaving out the Southwestern Railroad Company, and there be power in the Central so to use its funds, and so to contract, the injunction would have to be dissolved as to them. But we do not think the Central Railroad Company has, under its charter, the power claimed for it. The charter of this company was first granted in 1833 by the name of "The Central Railroad and Canal Company of Georgia," for "the purpose of opening a canal or railroad communication from the city of Savannah to the interior of the State," and was, by its charter, "made capable in law to buy, hold and sell *real and personal property, and make contracts,* (indefinitely,) and do all lawful acts properly incident to a corporation and necessary and proper to the transaction of the business for which it was incorporated :" Prince's Dig., 300. In 1835, the charter was remodeled, the name was changed to the Central Railroad and Banking Company, banking privileges were given to it, and its powers to build a canal were dropped out of the charter. The first words of the charter are : "For the purpose of laying, building and making a railroad communication from the city of Savannah to the interior of the State "—(Macon.) It was made "capable and able in law to have, purchase, receive, possess, enjoy and retain to them and their successors, lands tenements, hereditaments, goods, chattels and effects, *of whatsoever kind, nature*

*or quality the same may be,* and the same to sell, grant, demise, alien or dispose of," provided that said incorporation "shall not purchase and hold more *real estate* than may be necessary and proper for the purpose of laying, building and sustaining said railroad, and such as shall have been *bona fide* mortgaged to it as security or conveyed to it in satisfaction of debts previously contracted in the course of its dealings, or purchased at sales upon judgments which have been obtained for such debts." The road was required to be completed in eight years, (by 1843.) This charter further provides, that after twenty-five years have expired from the time *fixed by this Act* for the completion of the road, the banking powers should cease, but the "said Central Railroad and Banking Company of Georgia, shall, after the lapse of said twenty-five years, be and remain incorporate and vested, as to their *own works*, with all the estates, powers and privileges by this Act granted and secured, except the *exclusive right*, by this Act granted, (to build a railroad between Savannah and Macon,) and except the banking privileges hereby granted:" Prince's Dig., 326, 334. Subsequently, the time for the completion of the road was extended two years: Act of 1841. By the Act of 1835, the banking powers were to cease in twenty-five years after the expiration of the time fixed by this Act for the completion of the road. The Act of 1841 says nothing of the banking privileges, though it extends the time for the completion of the road two years.

Charters are to be construed strictly: Revised Code, section 2331. By the *words* of the charter the banking powers ceased in 1868, nor is there anything in the words or object of the amendment of 1841, to require the construction that the Legislature intended to extend also the banking powers of the company. It is a well settled rule for the construction of charters of incorporation, that they are to be construed strictly in their grants of power, and that nothing is to be implied in favor of the company. In the case of the Charles River Bridge vs. Warren Bridge, 11 Peters, 543, Taney, C. J., says: "The rule of construction in such cases is well settled both in England and by the

decisions of our own tribunals.   In 2 Barn. & Adol., 793, in the case of the proprietors of the Stansbridge Canal against Wheeley and others, the Court say: The canal having been made under an Act of Parliament, the rights of the plaintiffs are derived entirely *from that Act.*   This, like many other cases, is a bargain between a company of adventurers and the public, the terms of which are *expressed* in the statute, and the rule of construction in such cases is now fully established to be this: That any ambiguity in the terms of the contract, must operate against the adventurers and in favor of the public, and the plaintiffs can claim nothing that is not clearly given them by the Act." See also Revised Code, section 2331.

By the original charter, the banking privileges were to cease at the end of twenty-five years after the period fixed by *that Act* for the completion of the road, and it would be a violation of the rule laid down by Judge Taney to say that the extension of the time for the completion of the road by the Act of 1841, extends also by implication, the banking powers of the company for a period of two years.   Whilst the banking powers of this company were in existence, perhaps the investment of a portion of its funds in stocks of any kind, as a matter of *legitimate banking business*, and not for the purpose and with the intention of controlling some other enterprise, was within its powers.   We do not, however, go into that subject as, at the date of the proposed contract, the banking powers of the company had ceased.

4. The question then before us is simply this: Has the Central Railroad Company, under its charter, after its banking powers have ceased, the right to make a contract with the city of Savannah by which it shall become the owner of twelve thousand three hundred and eighty-three shares of the Atlantic and Gulf Railroad, a road running also from Savannah to the interior of the State, to-wit: to Bainbridge on the Flint River.   The right to make this contract is denied by Mr. Collins, Mr. Hull and others, stockholders in the Central Railroad and Southwestern Railroad Companies, who do not consent to the same, and insist upon it that it is

a violation of *their* rights under the charter, for two reasons: 1st, that it is a contract *ultra vires*, beyond the powers granted in the charter. 2d, that it is a contract contrary to the pub-lic policy of the State, and therefore void.

· It is replied to this that the bill and answer show that the Atlantic and Gulf Railroad Company is so managing its affairs, in carrying freights at ruinous rates from Bainbridge, as materially to injure the Central Railroad Company, and that the intent of this contract is merely to enable the Central Railroad Company to protect itself; that it is, in truth, necessary for self-preservation, and that the power to make it is derivable, from its expressly granted power to maintain its own road, that the power granted in the charter to "have, purchase, receive, possess, enjoy and retain to them, and to their successors, *lands*, rents, tenements, goods, chattels and effects, of whatsoever kind, nature and quality the same may be, and the same to sell, grant, demise, alien or dispose of," is an indefinite grant to purchase and hold any kind of property whatsoever, and that this was so contemplated by the charter, because the power to purchase and hold *lands* is by a proviso restricted to *such lands* as it may acquire, in satisfaction of debts due it, and such as may be necessary and proper for laying, building and sustaining the railroad.

, At first blush, this last position seems a very strong one; but upon a close examination of the whole section in which these words are found, and especially upon viewing them in the light of the long and well established rules for the construction of Acts of incorporation, the argument will appear more specious than sound.

5. The words immediately preceding those relied on, are: "for the purpose of laying, building and making a railroad communication from the city of Savannah to the interior of the State," the subscribers, etc., "are made capable and able in law, to have, purchase, receive, possess and enjoy lands, rents," etc., etc. The *purposes* of the charter are to enable the company to build and maintain the railroad, and it is for this purpose and for this purpose only *any* of its powers are

granted. For this purpose it may acquire and hold any kind of property whatsoever, but for any other purpose it cannot only not acquire any kind of property, but the company itself has no existence whatever. These are the *words of the charter*. Nor is there anything in this detailed specification, of the things which the company may own and possess that at all enlarges the purposes for which it may own and possess them. . Even without these words the company would have just the same powers. Every corporation "for the purposes declared by the charter," might, by the common law, hold and possess any kind of real and personal property, and make any kind of a contract whatsoever: Angel & Ames on Corporations, 125, 251 ; but for any other purpose it could hold nothing, and could make no contract of any kind: Angel & Ames on Corporation, 251, 252. Nor is there anything in the proviso limiting the *quantity* of real property which the company may purchase and *hold* which enlarges the *objects and purposes* for which the company may purchase, *hold* and sell any kind and amount of personal property. The real estate which it may *hold* is limited in *quantity*, the personal is not.

It is true that the restraining words as to real estate are themselves very broad, to-wit: "shall *not* hold more real estate than may be necessary and proper for the purpose of laying, building and sustaining said railroad ;" but the fact that the Legislature added other words, to-wit: "and such as shall be *bona fide*, mortgaged or conveyed to it in satisfaction of debts," etc., shows conclusively that the words "building, laying and sustaining" in the proviso, were intended to confine the company in its purchase and *holding* of real estate, to such as was necessary to lay the track upon, build the usual offices, stations, shops and depots upon, etc., and not in the enlarged sense in which they are used in declaring the purpose for which the charter is granted.

To give to these latter words the meaning contended for, to-wit: that they enlarge the powers granted as to personal property, indefinitely, so that the company may purchase and hold personal property for any purpose, would be to make

ATLANTA, DECEMBER TERM, 1869.     623

The Central Railroad Company *et al.*, *vs.* Collins *et al.*

the Central Railroad and Banking Company a corporation for any purpose whatever. It might, with the same reason, own steamships, take contracts for house-building, buy and sell cotton, open commission houses, keep hotels, buy and sell fancy stocks, or engage in any business or enterprise whatever, that the cupidity of its directors, or their fancy or their folly might suggest to them. It is either confined in all its powers, to the purposes and objects for which the charter is granted, or it is not confined to any particular purpose whatever, save that it shall not *hold* more than a certain quantity of real estate. Either the Central Railroad Company is, like other corporations, limited in the enterprises which it may undertake and the property which it may possess and the contracts which it may make, to such as come fairly within the scope and purposes of the charter, or it is without any limit at all, and the Legislature of 1835 has been guilty of the folly of granting a charter, indefinite in duration, with an immense capital, and capable, if it so desires, of engaging in any enterprise it pleases. I cannot so construe this charter. The very first words of it define and limit the purposes and objects for which all its powers are given, and the 24th section expressly provides that after its banking powers have ceased, it shall only "be and remain incorporate and vested *as to its own works,* with the estates, rights, powers and privileges granted by the Act."

But it is said that the power to purchase this stock is derivable from the power expressly given to "maintain the road;" that it is necessary for the self-preservation of the road, and arises by *implication* from the very purposes and objects for which the charter was granted. The basis of this argument is that it is necessary for the "maintaining" of the Central Railroad, that it shall take a decided part in the "management and maintaining" of the Atlantic and Gulf Railroad, and as by the admitted rules of the common law, a corporation may make all contracts necessary, either directly or incidentally, to enable it to effect the purposes of its creation, therefore it has the power to purchase enough of the stock of the Atlantic and Gulf Railroad to enable it to protect itself

by controlling the unwise management of the Atlantic and Gulf Railroad.

The purposes of the charter of the Central Railroad are the "laying, building and making" the road. The words of the charter do not in express terms include the "maintaining and sustaining" it, but we do not doubt they are included, since the "maintaining and sustaining" are necessary to the very objects of the grant. But what does a grant to maintain and sustain a railroad include? Can it in any fair sense be construed to authorise the engaging in any enterprise which will extend the business or lessen the rivalries of the company? If this be so, the whole doctrine so frequently and so emphatically stated in the books and decisions is a sham. The "maintaining and sustaining" of the road, has reference to keeping it in repairs, supplying it with machinery, and such like acts, and not to projects for extending its business, by schemes and enterprises not contemplated and expressed in clear, unambiguous terms, by the charter itself.

Every charter of a private corporation is a contract, first between the State and the corporation—to which each is solemnly bound—the State that it will not impair the obligation—the corporation that it will perform the objects of its incorporation and keep within the powers granted to it: 4th Wheaton, 518; secondly, between the stockholders themselves. The stockholders are bound to consent to the management of the affairs of the corporation by the majority, and by the by-laws which that majority makes. And the whole, on the other hand, agree with each other, that they will apply the funds of the company to the *objects and purposes of the charter*, and not otherwise: *Young vs. Harrison*, 6 *Ga. R.*, 130. Both as to the State and between the corporators, the law of this contract is the charter. The State has granted to it no rights, and the individual stockholders have clothed it with no rights, except such as are clearly and expressly set down in the charter: 13 Penn., 133; 28th Penn., 352; 18 Howard, 341.

Corporators are too apt to forget this fundamental law of their being. In the daily habit of transacting business, in

the name of the company as though it were an individual, they are apt to slide into the notion that a corporation *is* an individual in all respects, so far as business matters are concerned.

But a corporation is a mere creature of the law, and only exists at all, for the *purposes* declared in its charter, and has absolutely no powers but those which the law *confers* upon it. It is a creation of the law, and in the very nature of things is just what the law makes it, no more, no less; and by the word law here, I do not mean the general law which regulates the powers of persons, but the Act of incorporation, the charter, the constitution.

There are certain general rules which have, time out of mind, been adopted by the Courts in their investigation of the powers of incorporations, that it may be well to notice. 1st. As a corporation is the *mere* creature of the Act of incorporation, it has no other powers except such as are in said Act expressly granted, or are necessary to effect the *ends* and objects of its existence. 2d. Charters being private Acts, or rather contracts between the public and individuals, the charter is to be strictly construed, nothing is to be taken by intendment or inference. Being a creature of the law, it is made up of just such rights as its charter gives it; not that every power which it possesses must be granted in detail, but it is confined in its operations, to the objects and purposes expressly set forth in its charter, and it can undertake no other enterprise than is there expressly mentioned: *Frederick et al., vs. City ˙ Council of Augusta,* 5 *Ga.,* 561; *Mayor, etc., vs. Macon & W. R. R. Co.,* 7 *Ga.,* 221; 8 *Ga.,* 23; 9 *Ga.,* 213; *Winter vs. Mus. R. R.,* 11 *Ga.,* 438.

The books are full of decisions in illustration of these positions. In the case of the East Anglian Railroad Company vs. East. Count. Railroad Company, 7 English Law and Equity Reports, 505, the charter was for the "purpose of making and maintaining" a particular railway. The company had leased another railway, and had covenanted to pay the costs of soliciting bills then pending in Parliament, by which the other railway should have power to make extensions and branches, and the action was for a breach of the

covenant to pay said costs. Jervis, Chief Justice, in deciding the case, says. " It is clear the defendants have a limited authority only, and are a corporation only for the purpose 'of making and maintaining' the railway sanctioned by the Act, and that their funds cannot be applied for any other purpose than that directed by the Act. Indeed, it is not contended that a company so constituted can engage in new trades not contemplated by their Act, but it is said they may embark in other undertakings, however various, provided the object of the directors be to increase the profit of their own railway. This is in truth the same proposition in another form ; if the company cannot carry on a new trade, because it is not contemplated by the Act, they cannot embark in other undertakings not sanctioned by the Act, merely because they hope the speculation may ultimately benefit the stockholders."

In Wood vs. Greenville and Raleigh Plank Road Company, 3 Jones' Equity (North Carolina Reports) 183, when a company was chartered "to build a plank road from Greenville to Raleigh," the Court at the suit of a stockholder restrained the company from using the funds of the company to buy stages and horses, to establish a mail route over the road.

In Coleman vs. Eastern Counties Railway, 6 English, Railroad cases, 573, it was held that the directors of a Company have no right to pledge the funds of the Company in support of any project not pointed out by their charter, although such project may tend to increase the traffic upon the Railway though a *majority* of the stockholders may have consented and the object be not contrary to public policy.

In the case of Solomons vs. Lang 14th Jurist for December 1840, the company had power by its charter to " build and maintain " a Railway. In a certain legal and legitimate way, under the charter, the company became possessed of certain shares in another Railway. Subsequently, it undertook to *purchase other shares* in the same company. Lord Langdale, M. R., held that this was an *unauthorized* application of the funds of the company.

This Court in *Mayor, etc., vs. Macon and Western Railroad*, 7 *Ga.*, 221, held that it was not in the power of the

Macon and Western Railroad, chartered to carry passengers, etc., from Macon to Atlanta, to undertake to transport produce *through* Macon, across the bridge, to the Central Railroad depot.

In Merritt vs. The Shrewsbury & Chester Railway, the company undertook to improve the navigation of the river Dee, upon which, by their charter, they had wharves and warehouses, and upon which also came much of the freight carried upon the road, but the Court held such an undertaking *ultra vires:* 3 Eng. L. & E. R., 149. In 16th English Law & Equity Reports, 180, it was held that a railroad company could not contract to pay the expenses of a managing committee of a new railway company in application to Parliament for a charter. See also E. A. R. R. Co. vs. The Eastern Co. Railway Co., 21 L. Rep., (N. S.,) and the Court say they are a corporation only for the purpose of making and maintaining the East. C. Railway, and they cannot engage in a new trade. See, also, 10 Beavan, 1; 6 Railway Cases, 152; 43 N. H.; 5115.

These cases all proceed upon the well established principle that a corporation has no powers except those expressly granted by its charter, and such as are necessary to the *declared* objects of the grant, that the charter is to be strictly construed, and that the capital stock, credit and property of every kind, is to be used solely for the purposes and objects of the charter. So long as a company confines itself within the " purposes and objects declared by the charter," the Courts will sustain it, but when it undertakes new and distinct enterprises not declared in the charter, under a pretence that they are in furtherance of the declared design, the Courts will restrain them. The power to do acts and make contracts necessary to enable a corporation to answer the ends of its creation, like the express grants of power, is also to be strictly construed, and is limited by all the cases and by the general principles of all the books, with this qualification, that even for this purpose it cannot engage in any new and distinct enterprise, involving new risks to its stockholders, and not fairly within the terms of the original grant: 18th How.,.

341, 485; 2 Russ. & My., 480, 470; 4 Railway Cases, 492; 7 Hare Chan. R., 114; 4 My. & Craig, 134; 1 Edwards, 84; 22 N. Y., 274; 13 Eng. Law and Equity, 513; 4 Russ., 562; 1 Black, (U. S.) 449. The purchase of stock in another railroad company with intent to hold it, and especially, as is admitted by the answer in this case, with intent to use the power thus acquired to secure an interest in the management, either for good or evil, of the road, seems to come exactly within the principles which we have deduced from an unbroken series of decisions both in England and this country.\

If the Central Railroad Company may lawfully buy twelve thousand three hundred and eighty-three shares in this road, it may lawfully buy all the shares, become the owner of the road, and thus, without any grant from the State of Georgia, *this* company may have power to manage and maintain *two* railroads from Savannah to the interior of the State. Nay, the same principles precisely which would derive from its charter this power, would authorize it to become the owner of every railroad in the State, and of every other corporation and enterprise in the State, the management of which may in any way affect the interest of the Central Railroad Company. We do not think the stockholders of the Central Railroad Company, by their subscription, bound themselves to any such indefinite and unlimited enterprise. They contracted to give to the majority of the stockholders a control over their funds, for the purpose of making and keeping up and using a railroad from Savannah to Macon, and the appropriations of the capital, or credit, or funds of the company in any other enterprise, against the consent of any of the stockholders, is a violation of the rights of those stockholders, and a Court of Equity will restrain the company from such an act.

6. Thus far we have considered this question solely in reference to the right of a stockholder to insist upon it that the company shall not violate his rights by compelling him, against his will, to become a partner in an enterprise not contemplated in the contract. But the stockholder has a right to insist upon it, that the funds of the company, in

which he has an undivided interest, shall not be used in violation of the public policy of the State.   He does not stand like a mere citizen on his rights as a citizen.   He is one of the owners of the funds, property and credit of the incorporation.   Its corporate privileges belong to him; at least he has a legal and pecuniary interest in them, and he has a right to refuse to allow them to be used against public policy, and to protect them against the danger of forfeiture by their uses contrary to that policy.   It is, therefore, a pertinent question in this case whether it is or is not contrary to public policy that the Central Railroad Company shall be permitted to obtain such an interest in the Atlantic and Gulf Railroad as is contemplated by this purchase.   All experience has shown that large accumulations of property, in hands likely to keep it intact for a long period, are dangerous to the public weal.   Having perpetual succession, any kind of a corporation has peculiar facilities for such accumulation, and most governments have found it necessary to exercise great caution in their grants of corporate powers.   Even religious corporations professing, and in the main, truly, nothing but the general good, have proven obnoxious to this objection, so that in England it was long ago found necessary to restrict them in their powers of acquiring real estate.   Freed, as such bodies are, from the sure bound to the schemes of individuals— the grave—they are able to add field to field, and power to power, until they become entirely too strong for that society which is made up of those whose plans are limited by a single life.

There is, too, in this country, a reason for strictly construing charters, and for confining corporations to their powers, that does not exist in any other.   Under other forms of government, if a charter be found to have privileges which prove dangerous, it is in the power of the State to alter or repeal the charter.   But getting their grants, as most of our corporations do, from the State, they are held to be contracts, and it is not in the power of the State, under the Constitution of the United States, materially to interfere with the grant however improvident or unwise it may prove to have been.

For these reasons it has, in this country as well as in England, ever been considered the very highest public policy to keep a strict watch upon corporations, to confine them within their appointed bounds, and especially to guard against the accumulation of large interests under their control. Without doubt much of the prosperity of this country is due to the large number of corporations which have been created, and especially have we to be thankful for the good effected by railroad companies. But I am strongly impressed with the conviction, that much of their success in developing the resources of the country is due to the very jealousy which has ever held them strictly to their charters, and has constantly been careful to prevent an undue accumulation of interests under one management. The certainty that each stockholder has, that his funds will be applied to known and declared purposes, have made them favorite investments for prudent men, whilst the rivalry which opposing interests engender begets an energy, economy, skill and enterprise that have had much to do with the remarkable progress which such enterprises have made. A colossal enterprise, assured of handsome dividends by the possession of a monopoly, may well rest upon its position, knowing that however the country may suffer from its exactions, its own profits are secure. It is the rivalry of opposing interests, the struggle for success, nay, even for life, with dangerous opposition, that gives life, enterprise and success to railroads as to other human undertaking. It has been the conflict with thirty State lines, each with its opposing interests, and with numerous seaboard cities, each seeking to attract the rich outpourings from the great interior that has begotten the mighty net work of iron which interlaces our extensive territory, and I am convinced that there is no public policy more striking than that which, whilst it fosters every such undertaking, is yet careful ever to keep in view the danger of a monopoly, and the good effect of rivalry and conflict between different companies. The Central Railroad is, and has long been, the pride of Georgia. The skill, energy and prudence with which its affairs have been managed, reflect great credit upon the men who have

had these affairs in their control, and the State may well be grateful for the success that has followed. Yet, we cannot but think it would be a measure fraught with great public evil to give to that company permission to control and man- its great rival, the Atlantic and Gulf Road.

Already has the State empowered the Central Company to control the Waynesborough, the Southwestern, and the Eatonton and Muscogee Roads, making its whole line about six hundred miles in length. But all these are feeding roads of the line from Macon to Savannah, and there is no rivalry between them. The Atlantic and Gulf Railroad has also Savannah for its eastern terminus, whilst its western end strikes the Flint River at Bainbridge, and, connected thus with the Chattahoochee, it opens an active and effective com- petition with the Central and Southwestern Railroads for the trade of our great cotton region. Indeed the admitted facts of this answer show that the very object of the contem- plated purchase, the sole motive which prompts it, is to pre- vent the ruinous competition which the Gulf Road has already entered into for the freights of the Flint and Chat- tahoochee regions.

Even a petty tradesman cannot legally bind another not to carry on a particular business over any large extent of territory ; and here is a contract, the object of which is un- blushingly avowed to be to so get control of the Atlantic and Gulf Road, as that its present mode of carrying freights at low rates, shall cease, and the very object of the Legisla- ture in granting the charter, and becoming itself a large stockholder, be thwarted.

As a matter of course if the power to make this contract was granted in the charter, the public policy of such a grant would not be a matter for the consideration of the Courts ; but, as we are clear there is no such grant, we mention it as an additional reason why the rules for the strict construction of the charter should be adhered to, and the Courts should be prompt to lend their aid to the complainants, who, as they are stockholders in these roads, have a right to insist upon it that funds and credit in which they have an interest shall

not be used to the detriment of the public interests and in violation of the plain policy of the State. See cases quoted above, as to the rights of a corporation and the authority of even a single stockholder to interfere and restrain the company.

7. But it was said in the argument that the Legislature has plainly indicated, by its enactments, that the Central Railroad Company may acquire an interest in the management of the Atlantic and Gulf Railroad. By the Act of 1852, the Central Railroad was clothed with power to lease several railroads by name as well as any other road that might "connect" with the Central; and by the Act of 1863 authority was given to the Central and Atlantic and Gulf, to connect their tracks at the city of Savannah. To this it may, in the first place, be replied, that any such power, though expressly granted, does not bind any of the stockholders who do not consent to it. Each stockholder has rights in the nature of contract, rights in the limitations, as well as in the grants to the corporation, and even the Legislative will cannot, under the Constitution of the United States, impair those contract rights by making him, against his will, an adventurer in an enterprise not contemplated by the original charter. See the cases above. But under the rules which we have referred to for the construction of chartered rights, that they must be construed strictly, not carried beyond the express words of the Act, that ambiguous words are to be construed against the company and nothing to be taken by implication or intendment, even the right to lease would not give the right to buy or to become permanently interested in a road by the purchase of its stock. The two enterprises are wholly different in their nature and in their risks, and a stockholder might well consent to one and refuse to consent to the other. Nor is it fair to give to the language of the Act of 1852 such a meaning as to include within its provisions the Atlantic and Gulf Road, even though the Act allowing the Central and that road to connect be a valid Act under the Constitution of 1868. The words of the Act of 1852 are "other connecting roads," and this after

specifying by name, the Southwestern, Waynesborough and Eatonton Roads. These roads are *feeders* to the Central Road, their interests are in harmony, and both the public and the stockholders of each road are interested in their acting in concert.    But the Atlantic and Gulf Road is a rival of the Central.    Each terminating at the seabord, they penetrate, at their extremities, and by their connections, the distant Southwest, and it is the very life of the traffic and travel of that region, that these two great enterprises shall compete with each other for the public patronage.

But again, the Act of 1863 was passed during the war for a special purpose, avowed in the Act itself, and, whether avowed or not, plainly for the purpose of aiding in the war against the United States, and by the express terms of the Constitution of 1868, is void : Art. II., sec. 3d, Const. 1868. I only allude to the technical illegality of this Act as a reply to the claim which is attempted to be set up under it, when nobody pretends that such a consequence ever for a moment entered into the minds of those who passed it.    All that is pretended is, that by allowing "the connection" the Legislature has placed the road on a footing with those roads which the Central Railroad may lease, though it is not even contended that it was the intent of the Legislature, by this Act, to grant any such privilege to the Central Railroad.    To one technical, literal argument, we reply the other, that the Act upon its face is void, as being in aid of the war against the United States.    One word more upon this same branch of the subject.    These grants of the right to lease, imply the assent of the road that is leased, and to draw from such a power, to-wit : a power to control a road with its assent— the assent, it must be remembered, of every one of its stockholders—a right to control it by purchasing a majority of its stock, is an *implication* of a right to the injury of the others, in the very teeth of the settled rules for the construction of such grants, which, as we have abundantly shown, has been universally adopted by the Courts, both of England and America.

8. But it is contended this bill comes too late—that the

contract was consummated before the bill was filed, and that the city of Savannah is not bound to take notice of the want of power in this company to make this contract. As to the Southwestern Railroad, the city is, as appears by the sale itself, a stockholder in that road. It appears also by the answers, that the Mayor of the city of Savannah, who signs this contract, is a large stockholder in the Central Railroad. And it is a further fact that the city of Savannah, as appears by the charter of the Central Railroad, was one of the corporators of that road : Prince's Digest, 300. If it were necessary to bring home notice to the city of this want of power, the evidence of notice is technically conclusive.

But if this contract is illegal, on account of public policy, notice is not necessary, since it is a settled rule that in such cases no person can be innocent, as everybody must be presumed to know the law: Code, sec. 7.

We do not discuss the other position bearing upon this question of notice, to-wit: that by our law all Acts of the Legislature are public Acts, (Act of 1819; Prince, 215; Code, section 3762,) because we deem it unnecessary in this case, it being plain from the record, that the city of Savannah had notice in law of the powers of these companies.

BROWN, C. J., concurring.

*For the purpose of laying, building, and making a Railroad communication* from the city of Savannah to the interior of the State, a company was incorporated by the name and style of the Central Railroad and Banking Company of Georgia, with power to have, purchase, receive, possess, enjoy and retain, to them and their successors, lands, rents, tenements, hereditaments, goods, chattels and effects, of whatsoever kind, nature or quality, the same may be; and the same to sell, grant, demise, alien or dispose of. The exclusive right to construct, keep up and use a railroad between the city of Savannah and the city of Macon, together with banking privileges was granted to said company. But this exclusive right and the banking privileges, are only given for

The Central Railroad Company *et al.*, *vs.* Collins *et al.*

twenty-five years, " to be computed from the time fixed by *this Act* for the completion of the works authorized by this Act—the Act of 14th December, 1835. "*Provided,* nevertheless, that the Central Railroad and Banking Company of Georgia, shall after the lapse of said twenty-five years, be and remain incorporate and vested *as to their own works,* with all the estates, rights, powers and privileges by this Act granted and secured." Eight years is allowed by this Act for the building and completion of the Road. It follows therefore, that the exclusive right to keep up a railroad between the two cities, and the banking privileges, expired on the 14th of December, 1868 ; after which time the company remains incorporate with the privileges and rights granted by the charter, "*as to their works*" only ; and have no power to purchase or hold real or personal estate beyond what is necessary to keep up and maintain and successfully work a railroad between said cities; and, as is provided in another part of the charter, to purchase and hold such real estate as shall have been *bona fide* mortgaged to it as security, or conveyed to it in satisfaction of debts previously contracted in the course of its dealings, or purchased at sales upon judgements which shall have been obtained for such debts.

The Southwestern Railroad Company is chartered "for the purpose of constructing a railroad connection between the city of Macon and the navigable waters of the Gulf of Mexico," and it is declared that " they shall confine their efforts and enterprise to the building " of this road.

I hold that, under these charters, neither the Central Railroad and Banking Company nor the Southwestern Railroad Company has power to purchase stock in any other railroad company, and as such purchase is beyond the power of either company and endangers its charter, any stockholder of either company has the right to file his bill in Chancery to restrain and enjoin any such purchase at any time before it has been fully consummated by the transfer of the stock to the company and the payment of the consideration therefor, as against any vendor having *actual notice* of the provisions of the charter of the company. And in this case I hold that·

the city of Savannah, which was a corporator in the original charter of this company, had *actual notice* of the provisions of the charters of these companies and of the limits imposed by their charters upon their right to purchase.

The amended charter of the Central Railroad and Banking Company, section 3, provided that books of subscription to the stock of said company shall again be opened at such time and places as shall be appointed by the *corporation of Savannah*, and shall remain open at each place for the space of two days, giving at least thirty days' notice in the gazettes of Savannah, Macon and Milledgeville. It appears, therefore, that the corporation of Savannah was the agent appointed by the State to organize this company by opening the books of subscription for its capital stock; and it also appears by the reports before us, as part of the papers in this case, that his Honor, the Mayor of the city, was a stockholder in the company to a large amount at the time of the sale in question. I think it fair, therefore, to say that the city is chargeable with *actual notice* of the provisions of this charter, and of the limitations which existed upon its powers to make this purchase.

The city is also chargeable with like notice in the case of the Southwestern Railroad Company, as she was a stockholder in that company, and one share of its stock is included in the sale. Indeed I understand it to be a general principle of law, that a railroad company, without express authority given by the Legislature to make the purchase, can not purchase stock in another railroad company: Angel & Ames on Corp., 392; Redfield, vol. 1, page 143, note; 12 Beavan, 339. A corporation is not permitted to apply the funds of the company to objects other than those distinctly defined by its charter, or by Act of the Legislature, no matter how beneficial the misapplication might be to the company or to individual stockholders: 3 Eng. L. & E. Reps., 150; 16 do., 182; 73 Eng. Com. L., 73. The same principle is fully recognized and confirmed in the American cases: See Woodbury & Minot, 106; 24 Conn., 162; and 21 How. Reps., 442.

In the latter case the Supreme Court of the United States unanimously held that: When two separate corporations were created to make railroads, they had no right to unite and conduct their business under one management; nor had they a right to establish a steamboat line to run in connection with the railroads, and that notes given for the purchase of the steamboat can not be recovered upon. This authority of the highest judicial tribunal in this country is in point. If a railroad company has the power, without express authority conferred in its charter, or by statute, to purchase a single share of the capital stock of another railroad company, it has the like power to purchase *all* the shares of the capital stock of the other company, and take complete control of and manage the affairs of the company whose stock it has purchased, in connection with its own, which power is expressly denied by this decision of the Supreme Court.

I take it to be a well established principle in this Court, that statutes made in favor of corporations or particular persons in derogation of common right, are to be construed strictly, and that care should be taken not to extend them beyond their *express words*, or their *clear import:* 7 Ga., 221. In this case Warner, J., delivering the opinion of the Court, says: "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either *expressly* or as incidental to its *very existence.*" In 5 *Georgia,* 561, my learned associate lays down the same rule ably and forcibly. In 8 *Georgia,* 30, Judge Lumpkin lays down the rule that care should be taken not to extend such statutes beyond their express words or their clear import. In 9 *Georgia,* 221, Nesbit, Judge, says: "Grants of exclusive privileges to a corporation or an individual are to be strictly construed. The grantee takes nothing by *implication,* and the rule has been settled to extend thus far, to-wit: that any ambiguity in the terms of a contract between an individual or corporation and the public, in which exclusive privileges are granted, must operate in favor of the public, and against the individual or

the corporation." I might extend quotations from the rulings of this Court of like import, but I deem it unnecessary. It will not be denied that the charter of the Central Railroad and Banking Company is a contract between the corporation and the public. And the authorities above quoted settle the question that it can take nothing by *implication*, that care should be taken not to extend its powers beyond their *express words*, or their *clear import*, and that it has only such powers as the charter of its creation confers upon it, either *expressly* or as incidental to its *very existence*. I refer only to the charter of the Central Railroad and Banking Company, because it is admitted on all sides that its charter is more favorable to the plaintiffs in error than the charter of the Southwestern Railroad Company. If the power to purchase does not exist in the first named company, their case must fail.

Now, it does seem to me that this case, viewed in the light of these well considered authorities, is not even doubtful. The powers given to this company are expressly declared, by its charter, to be for the purpose of laying, building, and making a railroad connection from the city of Savannah to the interior of the State, and of maintaining the same. And since the banking powers, and the exclusive right to have a railroad between Savannah and Macon, have expired by their own limitation, this is the only purpose of the charter. Its whole scope and extent, as it *now* exists, is to maintain and successfully work the railroad between said cities, and all the powers conferred by the charter are to be construed strictly in reference to this object. The company remains "incorporate" and vested, *"as to their own works,"* with the powers specified in the charter, except as above stated, and vested with those powers as to their own works *only*.

By the Act of 1852, the Central Railroad is authorized to lease all railroads running *in connection with it*, or that may hereafter so run. And it was contended by the able counsel for the plaintiffs in error that this confers upon the Central Railroad Company the power to lease the Atlantic and Gulf Road, as a connection between them is authorized by the Act

of 1861.    And it is insisted that by this Act the public policy of the State is declared in favor of the control of the Atlantic and Gulf Road by the Central, or that, at any rate, since the passage of the Act of 1861, such control is not in violation of the public policy of the State.

There are two replies to this.    The first is that this record does not show that any such connection has in fact been made, and it is not a matter, it would seem, of which the Court can take judicial notice.    The second is that the Act of 1861 is not of force.    That Act is entitled "An Act to authorize the connection of the railroad of the Savannah, Albany and Gulf Railroad Company, with the railroad of the Central Railroad and Banking Company of Georgia, by a track running through or around the city of Savannah."    The preamble is in these words :    "Whereas, there exists an *absolute military necessity*, at this time, to connect the aforesaid roads."    The body of the Act then authorizes this connection.    Here nothing is left to inference.    The State was conducting war against the Government of the United States, and it is declared on the face of the Act what is the object and only object of the connection.    It was to meet an absolute military necessity which existed at that time.    The 11th Article of the Constitution of this State, ratified in 1868, adopts all Acts passed by any legislative body sitting in this State as such, since the 19th of January, 1861, including Irwin's Code, etc., "except so much of said several statutes, Code and laws as may be inconsistent with the supreme law herein recognized, or may have been *passed in aid of the late rebellion against the United States*, or may be obsolete, or may refer to persons held in slavery, which excepted laws are *inoperative and void*."    Argument is unnecessary.    This Act is not adopted.    On the contrary the Constitution declares it to be inoperative and *void*.    There is therefore no Act in force authorizing a connection between said roads or between the Central Road and the Atlantic and Gulf Road, with which, I believe, the Savannah, Albany and Gulf, has been consolidated.

Again I insist if the connection were legally authorized, that it does not come within the true intent or meaning of

the Act of 1852, authorizing the Central Road to lease all roads running in connection with that road. The Atlantic and Gulf Road does not run in connection with the Central in the sense of this Act. On the contrary, it runs in opposition to it, as a competitor for the freights and travel of a large section of country, and runs in a different direction, and through an entirely different part of the State. If the Act of 1852 can be fairly construed to embrace the Atlantic and Gulf Road, whenever a track is authorized to be laid between the two roads, it embraces every other railroad in Georgia, as they all connect in that sense, and the Central Road has power to lease every road in the State, so soon as it has the means; and it can, by a sufficient increase of fare and freights, in sections where it has destroyed competition, soon possess itself of the necessary amount of funds. Such could not have been the intention of the Legislature in the passage of the Act. It follows that there is no public policy of the State, recognizing the right or power of the Central Road to lease or otherwise control the Atlantic and Gulf Road.

But on the contrary, the public policy of this State, as clearly shown by its legislation, is to encourage fair and just competition, between the different railroad companies of the State, and to discourage monopolies. The fact that the State granted a charter to the Atlantic and Gulf Road, and subscribed to its capital stock, thereby aiding in its construction, shows that it was the policy of the State, to open a thoroughfare across the southern part of her territory, for the benefit of the people of that and the southwestern section, and for the encouragement of fair and just competition with the roads already in existence, thereby securing to her people the transportation of their freights on just and reasonable terms.

This public policy of the State is violated by the purchase by the Central and Southwestern Railroad Companies, of such quantities of the stock of the Atlantic and Gulf Road as will enable them, by the aid of other stockholders in their interest, to control that road, and destroy that just competition which the legislation of the State, and her subscription

to the stock of the Atlantic and Gulf Road, was intended to secure and perpetuate for the benefit of her people occupying a large extent of her territory, who would otherwise be left at the mercy of an over-shadowing corporation possessing the power to load them with unjust burdens, to accumulate a large reserved-fund, beyond just and liberal dividends to its stockholders, to be used in extending its control, by other like purchases, and making more complete its dominion over the government and people of the State.

The State of Georgia having been made a party to this bill, and having appeared as such, has the right, as was insisted by her able and eloquent counsel, Judge Lochrane, to object to the consummation of this purchase by the two railroad companies, plaintiffs in error, which has been attempted in violation of both her public policy and their charters.

It was urged with great zeal by counsel for plaintiffs in error, that a ruling against the right of these companies to make this purchase, would be productive of great mischief, as they have indorsed the bonds of other railroad companies to a large amount to aid in the construction of lines to run in connection with them, and that such a ruling as we now make, would render the indorsement void. Were that even so, it is no sufficient reason why we should not faithfully administer the law, as we find it. But such is not my understanding.

Those railroad bonds are usually payable to bearer, transferable on delivery, like a promissory note, and are due at some distant day in the future. They are therefore presumed to be given for a valuable consideration. And as it is presumed till the contrary is shown that every corporation, as well as natural person, discharges its legal duties, and confines itself within the scope of its legitimate powers, I am of opinion that a *bona fide* purchase of a bond, issued and indorsed as aforesaid, would have a legal right to compel the corporation by which it is indorsed, to pay the coupons as they became due, and the face of the bond at maturity. The corporation would not be allowed in this way to take

advantage of its own wrong, to the injury of a *bona fide* purchaser, who took the bond without *actual notice* of the fact that the corporation transcended its authority. In the case in 21st Howard, where the consolidated companies were held not to be liable for the notes given for the steamboat purchased by them, in violation of their charters, it appears in the statement of the case, that the assignee of the notes who brought the suit, took them *with notice.*

I am equally well satisfied that any stockholder of the company would have a right to file his bill to enjoin the indorsement of the bonds of another company when not authorised by the charter, or that the State, after the unauthorised indorsement is made, might proceed to forfeit the charter on account of its violation by the company. But if the stockholder acquiesces in the action of the company, till the bonds have been indorsed by the officers of the company, by authority of the board of directors, and have gone into circulation, and are in the hands of *bona fide* holders without *actual notice,* he will not then be heard, and the company will be estopped from denying the legality of its own act and will be held liable.

In conclusion, I will remark that the powers and liabilities of a corporation are fixed by its charter : Code, section 1670. A corporation can only purchase and hold such property, real and personal, as is "*necessary* to the *purpose* of its organization," and it can only do such acts as are necessary for the legitimate execution of *this purpose :* Code, section 1678. And a corporation forfeits its charter, by a wilful violation of any of the essential conditions on which it is granted : Code, section 1684.

In my opinion, the purchase, which is the subject-matter of this investigation, is not within the legitimate scope of the powers conferred upon these corporations, and is not *necessary* to the *purpose,* of their organization. And as the city of Savannah had *actual notice* of the extent of their powers, under their respective charters, the purchase being illegal and in violation of their charters, she has no right to insist upon its consummation.

The Central Railroad Company *et al.*, *vs.* Collins *et al.*

When the stock of a corporation is taken, there is an implied contract between the corporation and each stockholder that the corporation will not violate the charter, and for any act done by the corporation in violation of the charter, the stockholder may call it to account in a Court of Equity: 2 Russel and Mylne, 461; 13 Eng. Con. Ch. Reports, 131; 2 R. & M., 470; 4 John Ch., 573; 1 Eng. Railway cases, 153, 154. And equity will interfere by injunction to restrain the violation of a charter, whether the violation is by misapplication of the funds of the corporation, or the exercise of ungranted powers: Redfield's Railway Cases, 92, and notes; *Ibid*, 474, 475, and notes; 1 L. Reg., 154; Eden on Injunctions, 338–9.

I am therefore of the opinion that the judgment of the Court below, refusing to dissolve the injunction, is right and ought to be affirmed.

WARNER, J., dissenting:

This bill was filed by certain named stockholders in the Southwestern Railroad Company, and as stockholders in the Central Railroad and Banking Company, and as stockholders in the Atlantic and Gulf Railroad Company, who sued in their own right, as such stockholders, and as citizens of the State of Georgia, and as citizens of the city of Macon, in *behalf* of the citizens of the State, and in *behalf* of the citizens of Macon, praying an injunction to restrain the sale of twelve thousand three hundred and eighty-three shares of the capital stock of the Atlantic and Gulf Railroad Company, owned and held by the city of Savannah, to the Southwestern and Central Railroad Companies. The individual stockholders in said companies have the right to sue in a Court of Equity, in behalf of themselves, as such *stockholders* for an alleged violation of the charters of their respective companies, but have not the right to sue as citizens in *behalf* of the people of the State, or in *behalf* of the city of Macon; when the State is a stockholder in a railroad corporation, and is made a party to the suit, she occupies the same position as any other pri-

vate stockholder, as to her rights and privileges in that suit. By the amended charter of the Central Railroad and Banking Company it is declared that the said company, by its corporate name, "shall be, and are hereby, made *capable and able in law*, to have, purchase, receive, possess, enjoy and retain to them and their successors, lands, rents, tenements, hereditaments, goods, chattels and effects, of whatsoever kind, nature or quality the same may be, and the same to sell, grant, demise, alien, or dispose of; *Provided,* that said incorporation shall not purchase and hold more *real estate* than may be necessary and proper for the purpose of laying, building and *sustaining* said railroad," etc. The proviso to the 21st section of the amended charter secures to the company, *after* the lapse of twenty-five years and *after* the termination of their *exclusive* right to keep and use the railroad between Macon and Savannah, not only their *own works,* but all the *estates, rights, powers* and *privileges* by that Act *granted* and *secured,* except the *exclusive* right to run the railroad and the banking privileges granted. Under the plenary power granted by the charter of the Central Railroad and Banking Company to *purchase goods, chattels and effects, of whatsoever kind, nature or quality the same may be,* said company had the legal capacity to purchase from the city of Savannah the shares of stock in the record mentioned, and to enjoy the same, the city of Savannah being the legal owner thereof at the time of such purchase and sale; and although the Southwestern Railroad Company, one of the joint purchasers of the stock, may not have had the legal capacity under its charter to make such purchase, still, as the Central Railroad and Banking Company did have the legal capacity to make such purchase, the sale of the stock was a legal and valid sale. If the stock so purchased *was* purchased for the purpose of controlling the Atlantic and Gulf Railroad, as is charged in complainants' bill (which is positively denied by the defendants' answer,) still it is difficult to perceive in what manner that purchase would contravene the general policy of the State, in view of the previous legislation thereof, in regard to the Central Railroad and Banking Company. By an Act passed in 1852,

that company is specially authorized "to lease, and work for such time and on such terms as may be agreed on by the parties interested, the Augusta and Waynesborough Railroad, the Milledgeville and Gordon Railroad, the Eatonton Branch Railroad, the Southwestern Railroad, and such other railroads as now connect, or may *hereafter connect* with the Central Railroad, and to collect by suit or otherwise, the fares of travel and the charges of transportation on railroads so leased." The second section of that Act gives power and authority to the Board of Directors of the several railroad companies which now connect, or may *hereafter connect,* with the Central Railroad, to lease the same to the latter company.

By an Act passed in 1861, the Central Railroad and Banking Company are authorised to connect that road with the Gulf Railroad; and, therefore, under the authority granted by the Act of 1852, might lease the same, and obtain the control of the road in that way—which clearly demonstrates that it was not the policy of the State, (as manifested by the two Acts last mentioned,) to *prevent* or to *prohibit* the Central Railroad and Banking Company from having the control of the respective railroads which then connected with that road, or *thereafter* might connect with it, on such terms as might be agreed on by the parties interested in such connecting railroads. If the Act of 17th December, 1861, is void, the Act of 11th December, 1861, which authorised the two roads to connect, is not, so far as appears on the face thereof. The purchase of the shares of stock mentioned in the record by the Central Railroad, from the city of Savannah, in the Atlantic and Gulf Railroad, (the same being less than a majority of the stock,) would not enable the Central Railroad to control the Atlantic and Gulf Road, near as effectually as if it had *leased* it, and yet it is not against the declared policy of the State for the Central Railroad to exercise control over the Atlantic and Gulf Railroad by leasing and working it, and collecting the fares of travel and the charges of transportation thereon, but is entirely consistent therewith.

After a careful examination of the entire record in this case, I have not been able to discover the *injury* which the *com-*

*plaining stockholders* have sustained, or are likely to sustain, in consequence of the purchase of the stock in the Atlantic and Gulf Railroad by the Central Railroad and Banking Company from the city of Savannah. They have no right to complain in behalf of any *other persons,* either natural or *artificial.* Their complaint must be confined to themselves as *stockholders in the company,* and to such other stockholders thereof as may choose to come in and be made parties as such stockholders, and to *no other persons.* Considering their complaint as *stockholders in the particular roads named,* as alleged and set forth in their bill and the answer of the defendants thereto, I am of the opinion that the injunction, restraining the sale of the stock by the city of Savannah to the Central Railroad and Banking Company, should have been dissolved by the Court below, on the ground that this last named company had the legal capacity to purchase the stock under its charter, and that the city of Savannah had the legal right as well as the legal capacity to sell the same.